1  Max L. Tribble Jr.
   mtribble@susmangodfrey.com
2  Joseph S. Grinstein
   jgrinste@susmangodfrey.com
3  Eric J. Mayer
   emayer@susmangodfrey.com
4  SUSMAN GODFREY L.L.P.
   1000 Louisiana, Suite 5100
5  Houston, TX 77002-5096
   Telephone: 713-651-9366
6  Facsimile: 713-654-6666

7  David J. Healey
   healey@fr.com
8  Ana E. Kadala
   kadala@fr.com
9  FISH & RICHARDSON P.C.
   One Houston Center, Suite 2800
10 1221 McKinney St.
   Houston, Texas 77010
11 Telephone 713-654-5300
   Facsimile 713-652-0109
12

13 (Additional Counsel Listed on Signature Page)

14 Attorneys for Plaintiffs
   DR. DAN OLIVER and JEANNIE OLIVER on their own behalves and on behalf of all others
15 similarly situated

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                      (SAN FRANCISCO DIVISION)

19 DR. DAN OLIVER and JEANNIE OLIVER,         Case No. **1 1    1 2 6 0**

20              Plaintiffs, on their own behalves     **CLASS ACTION**
                and on behalf of all others
21              similarly situated,                   **INDIRECT-PURCHASER**

22        v.                                          **PLAINTIFFS' ORIGINAL COMPLAINT**

23 SD-3C LLC; PANASONIC CORP.;
   PANASONIC CORP. OF NORTH AMERICA;
24 TOSHIBA CORP.; TOSHIBA AMERICA          **DEMAND FOR JURY TRIAL**
   ELECTRONIC COMPONENTS, INC.; and
25 SANDISK CORP.,

26              Defendants.

27

28

E-filing



1

1    Plaintiffs, indirect purchasers of SD Cards, (which include all SD Cards, whether SDHC,

2  mini, micro and other forms of SD Cards), SD Card Intellectual Property, and NAND Flash Card

3  Intellectual Property, as defined below, on behalf of themselves and all other similarly-situated

4  indirect-purchasers, claim against all Defendants for the following complaints for price-fixing,

5  unreasonably restraining trade and other wrongdoing in this product and these technology markets

6  in the United States, the State of California and other States:

## THE PARTIES

**A.   The Plaintiffs**

9    1.    Plaintiffs, Dr. Dan Oliver and Ms. Jeannie Oliver, are residents of California who

10  have purchased SD Cards for end use and not for resale at retail outlets in California, Hawaii,

11  Nevada, and Arizona, among other places.  In doing so they indirectly purchased during the Class

12  Period SD Cards, SD Card Intellectual Property, and NAND Flash Card Intellectual Property from

13  one or more of the Panasonic, Toshiba, SanDisk and/or the SD-3C LLC Defendants named herein.

14    2.    They also purchased SD Cards, SD Card Intellectual Property, and NAND Flash

15  Card Intellectual Property, from other manufacturers and resellers who were licensed separately

16  by one or more Defendants on that Defendant's individual portfolio of SD Card Intellectual

17  Property, NAND Flash Card Intellectual Property, and by the intellectual property for SD Cards

18  owned or licensed by the SD-3C LLC.

19    3.    These Defendants (identified below) conspired and combined to charge multiple

20  royalties on the same royalty base and fixed the cost bases of the royalties charged.  As a result,

21  these Defendants fixed or inflated prices for SD Cards, SD Card Intellectual Property, and NAND

22  Flash Memory Card Intellectual Property in the United States and in the State of California among

23  other places. Plaintiffs and other members of the indirect purchaser class were injured as a result

24  of the harm caused to these relevant markets by Defendants' unlawful acts in paying inflated

25  prices for the SD Card products and the SD Card Intellectual Property and NAND Flash Memory

26  Card Intellectual Property.

27    4.    Defendants' wrongful acts caused unlawful harm to competition in at least the

28  following markets: the markets in the United States and the State of California for SD Cards; the

1  markets in the United States and the State of California for SD Card Intellectual Property; and the
2  markets in the United States and the State of California for NAND Flash Memory Card
3  Intellectual Property. This injury to competition and harm to these markets were caused by
4  conspiracy, combinations and other wrongdoing to at least artificially inflate to unreasonable
5  levels the royalty cost by the mechanism of "double charging" (or multiple charging) of royalties
6  for SD Card Intellectual Property and NAND Flash Memory Card Intellectual Property on the
7  same base NAND Flash Memory Component twice or more for the same purpose, by charging for
8  product certification marks beyond the reasonable cost of such certification, by artificially setting
9  the value of the base on which percentage royalties were charged by fiat and contract rather than
10 by market price, and by dividing intellectual property rights between themselves and others to
11 maximize the number of licenses and royalties they could garner for their own benefit. These acts
12 harmed competition in the relevant markets, and Plaintiffs were harmed by costs that were in
13 whole or in part passed on to the Plaintiffs and other consumers in the form of illegally inflated
14 prices.

15      5.      Plaintiffs and the members of the Indirect-Purchaser Class(es) were injured in their
16 businesses or property as a result of Defendants' conspiracy and combination to unreasonably
17 harm competition (without justifying counter-benefits) in the relevant markets, including by
18 among other things their illegal price-fixing and other unlawful agreements. As a result of this
19 unlawful harm to competition in one or more of these markets, the Plaintiffs and others similarly
20 situated paid more for SD Cards than they would have absent such illegal conduct.

21      **B.    The Defendants**

22      6.      Defendant Toshiba Corporation is a Japanese corporation with its principal place of
23 business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.

24      7.      Defendant Toshiba America Electronic Components, Inc. is a wholly owned and
25 controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900
26 MacArthur Blvd., Ste. 400, Irvine, CA92612.

27

28

3

1  8. Defendant Panasonic Corporation is a Japanese corporation, with its headquarters

2  at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Prior to October 2008, Panasonic

3  Corporation was known as Matsushita Electric Industrial Co., Ltd.

4  9. Defendant Panasonic Corporation of North America ("PNA"), a Delaware

5  corporation, is, upon information and belief, a wholly owned subsidiary of Panasonic Corporation,

6  with its principal place of business at One Panasonic Way, Seacacus, New Jersey 07094.

7  10. Defendant SanDisk Corporation is a Delaware corporation with its principal place

8  of business at 601 McCarthy Boulevard, Milpitas, California, 95035.

9  11. Defendant SD-3C LLC is a Delaware limited liability company with its principal

10  place of business at 180 Montgomery Street, Suite 1840, San Francisco, California 94104. On

11  information and belief, SD-3C has conducted licensing activities through its agent, Miller, Kaplan,

12  Arase & Co. LLP.

13  12. All defendants are doing business in this district, and throughout the State of

14  California.

15  13. Any actions or agreements these Defendants made outside of the United States

16  were done with the express purpose and intent of injuring trade and commerce in one or more of

17  the relevant markets in the United States.

18  14. Wherever in this complaint a family of defendant-corporate entities is referred to by

19  a common name, it shall be understood that plaintiffs are alleging that one or more officers or

20  employees of one or more of the named related defendant companies participated in the illegal

21  acts alleged herein on behalf of all of the related corporate family entities.

22  **C. Co-Conspirators**

23  15. Various persons and entities whose identities are unknown to Plaintiff at this time,

24  participated as co-conspirators in the violations alleged herein and performed acts and made

25  statements in furtherance of the conspiracy and wrong-doing of the Defendants. Once the

26  identities of these presently-unknown co-conspirators are ascertained, Plaintiff will seek leave of

27  court to add them as named defendants.

28

4

1     16.     The acts charged in this Complaint have been done by Defendants and their co-

2 conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,

3 or representatives while actively engaged in the management of each Defendant's business or

4 affairs.

5     17.     Each of the Defendants named herein acted as the agent or joint venture partner of

6 or for the other Defendants with respect to the acts, violations and common course of conduct

7 alleged herein. Each Defendant that is a wholly-owned or indirect wholly-owned or controlled

8 subsidiary of a foreign parent is the United States agent for its parent company.

9 **JURISDICTION AND VENUE**

10     18.     This action is brought under Section 16 of the Clayton Act (15 U.S.C. 26) to secure

11 equitable relief against the Defendants due to their violations of Section 1 of the Sherman Act (15

12 U.S.C. 1), and provisions of the Clayton Act. The claims for actual and exemplary damages are

13 brought under the Cartwright Act and other antitrust and unfair competition laws of the State of

14 California, to obtain restitution, recover damages, and to secure other relief against the Defendants

15 for violations of those state laws. Attorneys' fees, costs, expenses, of enforcement of these laws

16 are also sought under both federal and state law.

17     19.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in

18 this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. 26), Section 1 of the Sherman

19 Act (15 U.S.C.1), and Title 28, United States Code, Sections 1331 and 1337. This Court has

20 subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United

21 States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5

22 million exclusive of interest and costs, members of the indirect-purchaser plaintiff class are

23 citizens of states different from Defendants, and certain Defendants are citizens or subjects of

24 foreign states.[1]

25     20.     Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act

26 (15 U.S.C 22) and Title 28, United States Code, Section 1391(b), (c), and (d), because a

27 substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial

28

---

[1] This case is not brought under the patent jurisdiction of the Federal Courts.

1 portion of the affected interstate trade and commerce was carried out in this District, and one or
2 more of the Defendants has an agent, maintains an office, or does business in this District.

3     21.     Defendants conduct business throughout the United States, including in this
4 jurisdiction, and they have purposefully availed themselves of the laws of the United States,
5 including specifically the laws of the state of California. Defendants' products and intellectual
6 property are sold in the flow of interstate commerce, and Defendants' activities had a direct,
7 substantial and reasonably foreseeable effect on such commerce.

8     22.     Defendants substantially affected commerce throughout the United States and
9 specifically in California, causing injury to relevant markets, which in turn harmed Plaintiffs and
10 class members, because Defendants, directly or through their agents, engaged in activities
11 affecting all states, including California, to fix or inflate prices of SD Cards, SD Card Intellectual
12 Property, and NAND Flash Memory Card Intellectual Property, which conspiracy unreasonably
13 restrained trade and adversely affected each market without justifying circumstances to offset the
14 harmful effect of such conduct. Defendants have purposefully availed themselves of the laws of
15 California in connection with their activities relating to the production, marketing, and sale of SD
16 Cards and the licensing of SD Card Intellectual Property as well as the licensing of NAND Flash
17 Memory Intellectual Property from the Northern District of California. As a result of the activities
18 described herein, defendants:

19               a.     Caused damage to the residents of California and all other states;
20               b.     Caused damage in California and all other states by acts or
21                     omissions committed outside each such state and by regularly
22                     doing or soliciting business in each such state;
23               c.     Engaged in persistent courses of conduct within California and all
24                     other states and/or derived substantial revenue from the marketing
25                     of SD Cards (and services relating to such marketing);
26               d.     Committed acts or omissions that they knew or should have known
27                     would cause damage (and did, in fact, cause such damage) in
28

INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1            e.     California and all other states while regularly doing or soliciting

2                 business in each such state, engaging in other persistent courses of

3                 conduct in each such state, and/or deriving substantial revenue from

4                 the marketing of SD Cards in each such state; and

5            f.     Committed acts in foreign countries specifically targeted at

6                 harming these United States and California markets and consumers

7                 knowing that to do so would violate of U.S. and state law.

8      23.    The conspiracy and wrongdoing described herein affected adversely every person

9  nationwide who indirectly purchased SD Cards and second generation SD Cards, as Plaintiffs did,

10  throughout the United States. In doing so, Plaintiffs also purchased indirectly SD Card

11  Intellectual Property and NAND Flash Memory Intellectual Property from these Defendants in the

12  United States and in California. Defendants' conspiracy has resulted in an adverse monetary

13  effect on indirect-purchasers resulting from their adverse impact on the relevant markets in the

14  United States and California, among other states.

15                          **INTRA-DISTRICT ASSIGNMENT**

16      24.    The SD-3C has its principal place of business in San Francisco County, where a

17  substantial part of the events or omissions giving rise to this action occurred, including but not

18  limited to licensing of SD Card Intellectual Property and NAND Flash Memory Intellectual

19  Property, among other things. The SD-3C is a combination of Panasonic, Toshiba, and SanDisk,

20  and acts on their behalf in licensing essential utility patents individually owned by each of them,

21  essential design patents jointly owned by the three of them, design patents owned by SanDisk, and

22  copyrights and trademarks owned by the SD-3C, for making SD Cards, and by extension NAND

23  Flash Memory Cards, from its offices in San Francisco. Pursuant to Local Rule 3-2(d), "all civil

24  actions which arise in the count[y] of . . San Francisco . . . shall be assigned to the San Francisco

25  Division or the Oakland Division." Therefore, assignment to the San Francisco Division of this

26  Court is appropriate.

27      25.    In that it involves a common set of operative facts, this case is related to *Samsung*

28  *Electronics Co., Ltd. v. Panasonic Corporation, et al.*, No 3:10-cv-03098-JSW, pending in the San

7

1  Francisco division of this Court. A copy of the complaint in that case is attached as EXHIBIT 1
2  and is incorporated herein by reference.

3  ## ALLEGATIONS

4      26.    This case involves a price-fixing cartel (the "Cartel"), made up of Panasonic,
5  Toshiba and SanDisk, a conspiracy and combination among the members of the Cartel with each
6  other, and with their "LLC", the SD-3C LLC ("SD-3C"), as well as other co-conspirators as yet
7  unknown. Each of the three Cartel members competes with each other in the market for SD Card
8  products and also the markets for SD Card Intellectual Property and NAND Flash Memory Card
9  Intellectual Property. The SD-3C acts on its own behalf, on behalf of individual Cartel members,
10  and jointly for Cartel members in holding title to copyrights and product certification trademarks
11  on behalf of its owners, as well as licensing portions of this same SD Card Intellectual Property
12  and NAND Flash Memory Card Intellectual Property delegated to it for handling by its owners.

13      27.    An SD Card is small (roughly postage stamp-sized) container that houses controller
14  circuitry and NAND flash memory circuits (these circuits are arranged on a "chip" or "die").
15  There are now several varieties of SD Cards of different sizes, mini and micro, and densities, but
16  all SD Cards are backward compatible (and where the form factor can be accommodated, forward
17  compatible) by use of adapters to compensate for differences in form factors and placement of
18  leads.

19      28.    In an SD Card, the controller circuitry and NAND flash chips are mounted on a
20  substrate (e.g., a PCB board), and then enclosed in plastic, with metal leads protruding from the
21  card that allow the circuits and components in the card to connect electrically to a host device,
22  such as a consumer "point and shoot" camera. SD Cards are encased in plastic shells of specific
23  form factors that are designed to fit into a slot in a host device (with or without an adapter), and
24  also to allow the leads to connect to leads within the host device (much as the prongs of an
25  electrical cord fit into a wall socket).

26      29.    SD Cards provide "permanent memory" ("non-volatile memory") for consumer
27  devices and other purposes. For example, other types of non-volatile memory include vinyl

28

8

1   records, cassette tapes, CDs, DVDs, hard disk drives, photographic film, EEPROMs,

2   CompactFlash Cards, XD Cards, Memory Sticks, and MMC Cards, and NOR flash memory.

3         30.    The SD Card performs its function by using a semiconductor device called "NAND

4   flash memory", which is a type of circuit built by the tens of thousands in a semiconductor wafer,

5   and cut into chips or die, that each contain thousands of such circuits. These chips or die are

6   smaller than a "dime," and "shrink" as manufacturing techniques improve. The NAND flash

7   circuits will hold electrical charge even after a power source is removed. The amount of charge

8   trapped in each circuit represents a "0" or a "1" or some other bit of information, from which a

9   processor can read, write and store computer-readable data. NAND Flash Memory Circuits can be

10   made where each circuit contains one bit of information (single level cell, "SLC") or more than

11   one bit (multi-level cell). The circuits are arranged in groups called sections, blocks or pages that

12   can store multiple bytes of data (a byte is eight bits of data forming a "word"), which can be read

13   or written to by a host device through a controller on the card. (The terminology has changed over

14   the decades NAND Flash Memory has been available and these terms have referred to different

15   groupings of circuits at different times). The host device puts the digital code into a format that is

16   perceptible by humans, editable, and otherwise can be used in different ways. The host device also

17   does the reverse: It takes an analogue image or sound, digitizes it, and ultimately the bits of

18   information are "written" through the controller into the NAND Flash Memory Circuits. In

19   addition, the controller will maintain the integrity of the groups of NAND Flash Circuits on the die

20   by rotating the use of different parts of the memory device so that all parts of the device wear

21   evenly. The distinguishing feature of all types of non-volatile memory is the ability to retain the

22   information recorded on them even if there is no power to the memory.[2]

23         31.    An SD Card is not fungible, however, with other types of non-volatile memory and

24   no other type of non-volatile memory can serve as a substitute for an SD Card where it is used in

25   the relevant markets for two reasons. First, host devices already designed for SD Cards and sold

26

---

27   [2] In contrast, a "DRAM", a "dynamic random access memory" loses all information stored in the
     device once the device loses power. A DRAM is like a "leaky bucket", in that it must

28     constantly be refreshed by electrical current to maintain the level of charge in the individual
     circuits that designate the data contained in each bit of information. This is known as a
     "volatile" memory device because it loses its data when power is removed from the memory.

1   to consumers (in the tens of millions) cannot be reconfigured (reverse engineered) in a

2   commercially or technically feasible manner to accept a different card with a different form factor,

3   controller or electrical properties, and yet permit the card to be inserted in whole into the device

4   (as in a point and shoot camera). Second, the SD Card has advantages not shared by other types of

5   non-volatile memory that make it uniquely suited to its function in consumer devices in its small

6   size, lack of moving parts (that can be damaged and consume larger amounts of power), and the

7   speed with which relatively large blocks of data can be "read" or "written": For example, a

8   cassette tape has moving parts, higher power and space demands, delicate tape that can twist or

9   break, and no efficient way to locate specific information on the tape; even mini-cassette tapes are

10  many times larger than an SD Card, making them unsuitable for consumer devices. Likewise,

11  vinyl records, optical discs, CD and DVD discs, as well as miniature versions of those disks, are

12  many times larger than an SD Card, require analogue or optical reader components with moving

13  parts, use more power, are easily subject to damage, and are also too large for many consumer

14  devices that can use the SD Card (e.g., a handheld camera). Hard drives and mini-hard drives

15  likewise have moving parts subject to damage and failure, use more power, and are not available

16  in the size of the SD Card. An EEPROM is a type of non-volatile memory that has no moving

17  parts and can be very small, but typically requires large amounts of power (or even ultra-violet

18  light) to "write" data to the device, erase data from the device, and has much more limited

19  capacity to hold data; they are not practical or even possible to use as a means to record new

20  information in most battery powered consumer devices (very early flash memory literature and

21  patents often referred to primitive flash memory as an advanced type of EEPROM). Video or

22  photographic film have many disadvantages compared to SD Cards: they require moving parts,

23  more power, images go through a development process in addition to processing of data by the

24  host device, degrade more quickly, are more difficult to edit (and cannot be edited to the extent of

25  a digital image), and cannot achieve the form factor of a small SD Card.

26      32.      Other types of NAND flash memory devices likewise do not compete with SD

27  Cards because their form factor or electrical properties are different: For example, a

28  CompactFlash Card is formatted to the standard of a computer hard disk, and has a much larger

INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1   form factor than an SD Card. An MMC card does not have a controller on the card that allows the
2   card to "read and write" information to the NAND flash memory (the controller must be built into
3   the host device), and does not have the same internal electrical circuits needed to be compatible
4   with an SD Card's host device. A USB "stick" (also known as a jump drive or thumb drive)
5   generally has a much larger form factor than an SD Card and protrudes from the device with
6   which it is used; further, it is designed to use the interfaces of the USB ports on laptops and other
7   devices, that have different interfaces and electrical connections and properties from SD compliant
8   devices. Memory Stick and XD cards are proprietary forms of NAND Flash Memory Cards
9   designed and used only for specific manufacturer's products (e.g., the Memory Stick is proprietary
10  to Sony, and the XD Card is proprietary to Fuji and Olympus).

11      33.     NOR flash memory is not a substitute for NAND flash memory because it is far
12  more expensive: It is designed to store, read and write information much more precisely
13  organized than in the much larger sections, blocks or pages of a NAND flash memory. NOR is
14  more like a non-volatile DRAM that works with data in "words" or "bytes"; and is typically too
15  expensive for use in consumer devices for bulk storage of data (although it may be used for a
16  different purpose in the same device).

17      34.     As a result the SD Card has become the *de facto* standard for "point and shoot"
18  cameras, "Netbooks", cell phones, and other small consumer devices where it is necessary to have
19  an inexpensive non-volatile memory to record images, sounds, other data, and/or to provide
20  additional non-volatile memory to any memory embedded in the host device for bulk storage of
21  data. SD Cards have the great majority of the market for non-volatile memory for consumer
22  devices that use non-volatile memory (approximately 75-80%).

23      35.     The Specifications for SD Cards are copyrighted and those copyrights are owned
24  by the SD-3C. It appears the SD-3C permits an association of its licensees, the SD Association, to
25  license these specifications at a de minimis cost.

26      36.     The design patents for the form factor for the SD Cards (except for certain mini-
27  cards) are jointly owned by Panasonic, Toshiba and SanDisk, and licensed through the SD-3C.

28

11

1       37.    The trademarks that certify a product is compliant with SD standards are owned by

2   the SD-3C.

3       38.    No manufacturer can make an SD Card without a license to the design patents on

4   the form factor that must be obtained from SD-3C. Otherwise, the card will not physically fit into

5   the slot in the host device nor will the leads match their counterpart connections in the host device.

6   Furthermore, copyrights on the specifications must be obtained from the SD-3C or its re-sellers, as

7   they are essential to designing SD Cards into host devices to match electrical performance and

8   timing and are needed for network compatibility, among other things. Finally, it is not

9   commercially feasible to sell SD Cards, without the commonly recognized product certification

10  trademarks owned by the SD-3C prominently displayed on a card, the package for a card or host

11  device or package for a host device. Those trademarks permit consumers to be confident that their

12  cards and devices will be compatible.

13      39.    Each Cartel member has also given authority to the SD-3C to license what have

14  been characterized as nine essential utility patents and other unidentified essential utility patents

15  for SD Cards.

16      40.    The Cartel member refuse to license their utility patents that they claim are

17  essential to the SD Card individually or separately from the SD-3C for the field of use of SD

18  Cards. Indeed, Samsung Electronics Co., Ltd. has filed a complaint in this Court where it has

19  detailed its unsuccessful efforts to license these utility patents from their individual owner, SD-3C

20  member Panasonic, without going through the SD-3C. In that complaint, which is incorporated

21  herein by reference, Samsung describes how Panasonic insisted it would not unilaterally license its

22  patents provided to the SD-3C. The SD-3C, however, does not own or have exclusive licenses to

23  the utility patents that each of the Cartel members claim are essential technology to make the card

24  functional.

25      41.    Most technology for NAND flash memory, controllers, card systems using NAND

26  flash memory, and other inventions for NAND flash memory are instead owned separately and

27  licensed individually by each of the three individual members of the SD-3C. This is illustrated

28  and alleged in detail in Samsung's complaint is attached as Exhibit 1.

1    42.    Panasonic, Toshiba, and SanDisk each license individually these utility patents

2  (issued by jurisdictions with developed patent systems, such as the United States, Japan, Korea,

3  Germany, the United Kingdom, and others) to make the components of the SD Cards and the card

4  systems. Each of these three Defendants agreed with each other and with the SD-3C to "carve

5  out" a small portion of each of their rights relevant to SD Cards and to give the SD-3C the

6  authority to license those limited utility patent rights that they have each carved out of their

7  separate relevant patent portfolios. Other than nine utility patents listed on the SD-3C website,

8  neither the Cartel members or the SD-3C disclose all of their utility patents given to the SD-3C to

9  license, but claim many other "essential patents" are delegated to the SD-3C that they assert are

10  needed to make the SD Card (and are to be licensed from the SD-3C). In this way, a maker of an

11  SD Card could be called upon to take four licenses from the Cartel and the SD-3C: One each from

12  Panasonic, Toshiba and SanDisk, and then an additional license from the SD-3C.

13    43.    The SD-3C is an intellectual property pool that includes a pool of utility patents,

14  design patents, product certification trademarks and copyrights, among other things. But this

15  "pool" violates the tenants that the United States antitrust authorities and laws have said are

16  needed to make such a collaboration of competitors and price-fixing by competitors sufficiently

17  pro-competitive to outweigh the restriction on competition naturally resulting from such

18  arrangements.

19    44.    In truth, this purported "pool" is the antithesis of a legitimate pool because it does

20  not collect in one entity all of the intellectual property needed (or even most of the intellectual

21  property needed) to make the end product. Rather than provide the efficiencies, cost savings, and

22  other benefits of "one stop shopping" for manufacturers of these products, which allow for

23  cheaper transaction costs, lower royalties, less costly devices and greater availability of devices,

24  this pool is the opposite. It makes for higher transaction costs, more difficult and protracted

25  licensing transactions, more costly devices and limits the number of manufacturers of devices.

26    45.    By way of limited examples only, these price differences can be seen in the

27  consumer markets. At the site "pricegrabber.com", a SanDisk card 8 gigabits of flash memory

28  costs $14.85. In contrast, a USB stick by SanDisk costs $13.85 for the same 8 gigabits of

1  memory. The NAND Flash Memory Device, SD Card, where SanDisk is an owner of the

2  intellectual property, actually costs more than the device with the same amount of memory where

3  SanDisk does not own the form factor or interface.

4      46.    The SD-3C does not have the intellectual property from its owners or the authority

5  to license its owners' intellectual property to make an SD Card, without each licensee also going

6  to each of its three individual owners separately and obtaining needed rights to make SD Cards.

7  Instead of being "one-stop" shopping, the Cartel members have required "multiple stop" shopping,

8  and charged multiple royalties on each aspect of the intellectual property needed for the SD Card.

9  The intellectual property needed from the SD-3C is duplicative or de minimis of the separately

10  licensed intellectual property, yet the SD-3C charges out-sized royalties on the same components

11  already licensed by its members. The SD-3C also charges out-sized royalties on product

12  certification trademarks which should be readily available at cost (or close to cost) of testing and

13  policing products. The Cartel and the SD-3C further allow purchase of specifications protected by

14  copyright from its association of licensees, the SD Association, at *de minimis* prices, but again

15  increasing transaction costs. Further, the license the Cartel and the SD-3C require the SD

16  Association to provide requires admissions that more expensive licenses for other intellectual

17  property must be obtained from the SD-3C and/or the individual Cartel members, and also grants

18  them favorable rights.

19      47.    The net effect of this scheme is to approximately double the cost of royalties for SD

20  Cards (or more). Each component maker pays royalties to each SD-3C member, commonly on the

21  NAND flash component, controller, host interface controller, and/or card system. The SD-3C then

22  charges an additional 6% royalty for the intellectual property it licenses and/or owns to the

23  manufacturer that assembles these components into a finished card, or that simply applies a label

24  to a finished card purchased from one of the Defendants or a licensee to certify the product is

25  compliant with SD *de facto* standards and will function in an SD Device.

26      48.    The SD-3C charges a 6% royalty based on the selling price of the card, which in

27  turn is dictated by the card's memory capacity: That is the number of bits of information that the

28  NAND flash circuits in the card will store for the user. For each type and generation of SD Card

1    the form factor, position of the leads, controller circuitry, specifications and trademarks are the

2    same or similar or typically adaptable to each other using licensed kits: with the exception only of

3    form factors for cell phones and GPS and other small devices. The only substantial difference

4    between the cards of the same generation and type is the "memory density" (the amount of

5    memory capacity, the memory circuits on the card). Accordingly, a manufacturer of NAND flash

6    die would pay royalties to one, two or all three of the SD-3C members separately, and then the

7    SD-3C collects an additional 6% royalty from the seller of the SD Card driven by the number of

8    NAND flash memory circuits in the card.

9        49.    This perversion of a legitimate patent pool has permitted the Cartel to unreasonably

10   restrain trade in the United States, California, and other markets for SD Cards by charging double

11   or multiple royalties, and further unreasonably restrained the markets for SD Card Intellectual

12   Property, and NAND Flash Memory Card Intellectual Property in the United States and

13   California.

14       50.    The Cartel members and SD-3C also fix or inflate prices by insisting on certain

15   contractual rights to determine the monetary value of the royalty base on which the 6% royalty is

16   charged. They not only charge 6% but they determine what "value" the 6% is charged, which

17   effectively sets a floor for the price of the SD Card.

18       51.    These acts are intentionally done and their consequences were planned by

19   Defendants to inflate their profits and royalties beyond what they otherwise could hope to collect

20   in a competitive market. In all modern memory markets the final price of a completed memory

21   product charged to the purchaser naturally increases with memory density (regardless of the price

22   per bit). A roll of film for 100 photos costs more than a roll for 25 photos. A DRAM with 8 meg

23   capacity costs more than a DRAM with 1 meg capacity. These industry giants with long histories

24   in the memory and electronics markets know how memory prices are manipulated, and in fact

25   have been investigated for manipulating memory prices for other types of memory devices.

26   Basing the SD-3C royalty on a percentage of the price of the card constitutes an obvious effort to

27   double-recover royalties on the amount of NAND flash in the card. This is especially apparent

28

15

1   where they retain the option to fix the "value" of the base for the purpose of applying the

2   percentage rate for computing the royalty due to them regardless of actual selling price of the card.

3       52.   Toshiba is a vertically integrated firm, which manufactures consumer electronics

4   products, laptop computers, flash memory chips, develops technology for controllers for flash

5   memory chips, incorporates those chips into SD Cards, and incorporates the SD Card as a memory

6   source in its consumer products, including for example laptops sold for the U.S. market. Toshiba

7   develops technology in the SD Card intellectual property market and the NAND Flash Memory

8   Card market. Toshiba licenses its SD Card intellectual property (mainly utility patents), NAND

9   flash intellectual property (e.g., utility patents) and those utility patents for related components and

10   systems separately from other Cartel members or the SD-3C.

11       53.   SanDisk is a vertically integrated firm that manufacturers flash memory chips,

12   develops and manufacturers flash memory controllers, manufactures memory storage products

13   using flash memory chips (such as SD Cards, USB drives, and other products), and also

14   manufactures consumer products that use flash memory such as music players (MP3 players).

15   SanDisk develops technology in the SD Card intellectual property market and the NAND Flash

16   Memory Card market. SanDisk licenses its SD Card intellectual property (mainly utility patents),

17   NAND flash intellectual property (e.g., utility patents) and those utility patents for related

18   components and systems separately from other Cartel members or the SD-3C.

19       54.   Panasonic is a vertically integrated firm. It makes SD Cards, controllers for its

20   products, and it makes consumer products that use SD Cards to provide removable or expandable

21   available memory. Panasonic is the largest manufacturer of electronic consumer products in the

22   world.  Moreover, as shown by Exhibit 1, Samsung has alleged that Panasonic has refused to

23   license separately the intellectual property it has given to the SD-3C to license. Panasonic

24   develops technology in the SD Card intellectual property market and the NAND Flash Memory

25   Card market. Panasonic licenses its SD Card intellectual property (mainly utility patents), NAND

26   flash intellectual property (e.g., utility patents) and those utility patents for related components and

27   systems separately from other Cartel members or the SD-3C.

28

1    55.    Many other SD Card manufacturers, however, are non-integrated aggregators: They

2  are assemblers that purchase flash memory chips from other firms and then combine those chips

3  with plastic substrates, control circuitry and leads, and then incorporate those chips into SD Cards,

4  according to the specifications published by the SD-3C and the design patents for the form factors

5  and electrical connections. Each licensed SD Card is encased in plastic and has an affixed mark or

6  label indicating that the card is compatible for use in devices that can employ SD Cards for

7  memory.

8    56.    The version of the SD Card license that SD-3C has offered since 2006 not only

9  continues to charge "double royalties" or multiple royalties, calculated as a percentage of the sales

10  of SD Cards, but also permits the SD-3C to determine the "fair market value" of the SD Cards that

11  will serve as the basis for that royalty calculation, regardless of market or selling price. This

12  provision is the equivalent of a floor price, as it coerces licensees to charge at least the pre-

13  determined "fair market value" for their SD Cards: Otherwise, were they to charge less, their

14  effective royalty rates (costs) would go up vis-à-vis their competitors.

15    57.    Although purporting to operate like a legitimate patent pool, the licensing

16  arrangements among the SD-3C generate none of the pro-competitive benefits that might

17  otherwise justify an agreement among horizontal competitors to combine their intellectual

18  property rights for manufacture or sale of a product, license them as a package, and calculate

19  royalties based on a percentage of total sales. Because they have withheld critical patent rights

20  from the pool, the SD Card License, LAMS License, or other SD-3C licenses do not offer

21  licensees the efficiency of being able to obtain all of the rights owned by the Cartel and the SD-3C

22  needed to manufacture SD Cards in one transaction at a lower price and without the higher

23  transaction costs of multiple transactions.

24    58.    Moreover, notwithstanding illusory disclaimers to the contrary in recent versions of

25  the SD Card License, the SD-3C members have refused to offer industry participants any

26  alternative to executing the SD Card License—with its built-in "entry fee"—in order to

27  manufacture SD Cards.

28

17

## RELEVANT MARKETS

59.     There is are relevant markets in the United States, the State of California and other states, in the sale of finished SD Cards to third parties for use with devices that contain slots made for SD Cards (the "SD Card market"). Such finished SD Cards are broadly used in interstate commerce for a range of applications, including particularly for data storage in digital cameras, PDAs, digital audio players, and other electronic devices equipped with an SD Card slot. Millions of such devices have been sold, and continue to be sold, in the United States.

60.     Consumers with devices equipped with a SD card slot generally would regard an SD Card as the only option for use in the devices. Most consumers who operate a device that has an SD Card slot would not regard any memory card other than an SD Card as a reasonably interchangeable for the memory card permitted for operation by that device. Most consumers would not purchase a memory card for an SD host device (e.g., a point and shoot camera) without the SD product certification trademark.

61.     There is a separate relevant market in the United States, the State of California and other states, in the intellectual property used in the production of SD Cards, consisting of intellectual property developed for this end-use or that might be applied toward this end-use (the "SD Card Intellectual Property Market"). The SD Card Specification requires that certain SD Card functions be implemented either by a specific technology or by a particular solution for which the technological options are limited. The technologies required by the Specification or capable of providing a solution required by the Specification are not reasonably interchangeable with other technologies. Design patents jointly owned by the Cartel members are needed for SD Cards to fit into the "slots" for host devices for SD and mini-SD cards. Product certification marks owned by the SD-3C are needed to make the products marketable to consumers. Utility patents are alleged to be need to implement the SD Card standards.

62.     There is a separate relevant market in United States, the State of California, and other states for the intellectual property used in the production of removable NAND flash memory cards (the "NAND Flash Memory Card Intellectual Property Market"). This includes not only technology used in the production of SD Cards but also technology used in the production of other

INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1  flash memory card formats. The intellectual property included in the Flash Memory Card

2  Intellectual Property market is not reasonably interchangeable with other technologies that are not

3  suitable for use in flash memory cards. High royalty burdens for use of the SD Card format by

4  card makers and host device makers deter others from investing in alternative technologies due to

5  the extra cost of doing so above the cost of the SD Card rights.

6      63.    There are no other significant barriers to the interstate or international sale or

7  exchange of SD Cards, SD Card Intellectual Property or NAND Flash Memory Card Intellectual

8  Property. Accordingly, in each case above, the relevant geographic market is the United States,

9  each state, and its territories, or, alternatively, the world. Competition, however, is driven by

10 demand for SD Cards and SD host consumer electric devices in the United States and its several

11 states, including California.

12

13              **SIZE AND STRUCTURE OF MARKETS FOR SD CARDS AND SECOND**
                **GENERATION SD CARDS**

14

15     64.    The SD Card, including second generation form factors such as miniSD and

16 microSD, is now the dominant format in the flash memory card market for consumer devices. The

17 SD Association states that it is "the de-facto industry standard" and that "SD technology is used

18 by more than 400 brands across dozens of product categories and in more than 8,000 models." SD

19 Cards (including miniSD and microSD Cards) accounted for more than 80 percent of all flash

20 memory cards sold worldwide in 2009.

21     65.    The individual members of the SD-3C have benefited, and continue to benefit,

22 handsomely from their anticompetitive agreements. This conduct has allowed the members of the

23 SD-3C to extract hundreds of millions of dollars in royalty flows each year from flash memory

24 manufacturers, controller manufacturers, and numerous competing flash card manufacturers,

25 inflated profits from maintaining floors on prices for these products, they could not and would not

26 have otherwise collected but for their Cartel agreements and actions through the SD-3C. These

27 contracts, conspiracy, combinations are unreasonable restraints on trade in each relevant market as

28 they inflate prices without countervailing benefits to consumers and prevent others from having

19

1  the resources to invest in alterative NAND Flash Memory Technologies. This "double royalty" or

2  multiple royalty is passed on to consumers. Consumers also deprived of other technical and

3  commercial improvements that otherwise would likely have developed with additional investment

4  in NAND Flash Memory Technology.

5      66.    The market for the manufacture and sale of SD Cards is conducive to the type of

6  collusive activity alleged herein. Throughout the Class period, Defendants collectively controlled

7  a significant share of the market for SD Cards, both globally and in the United States. Panasonic,

8  SanDisk, and Toshiba together account for approximately 65-70 percent of the U.S. retail market

9  for SD Cards (including cards manufactured by an SD-3C member and sold by a third party under

10  its own brand name). The SD-3C members collectively account for a dominant share of both

11  standard format SD Cards (even allowing for the negligible sales volume of MMC cards that can

12  be operated in some cases in SD Card slots, but are not typically compatibly due to different

13  circuitry) and second generation SD Cards, such as miniSD and microSD Cards. The SD-3C

14  members' collective share of the total U.S. market for SD Cards, including both retail and sales to

15  original equipment manufacturers such as Motorola, is greater than 70 percent. Moreover, through

16  the anticompetitive conduct alleged herein, the Defendants have exercised control over prices with

17  respect to the remaining approximately 30% of the SD Card market into which other SD Card

18  manufacturers sell. As such, the Defendants' conspiracy to fix the price of SD Cards substantially

19  affected interstate trade and commerce in the SD Card market. Finally, the additional market

20  power that Panasonic and Toshiba have in consumer electric devices, helped to "tilt" the market

21  over time to use of the SD Card in such things as "point and shoot cameras, computers,

22  televisions, and other products.

23  ## CHOICE OF LAW ALLEGATIONS

24      67.    Toshiba America Electronic Components, Inc. is headquartered in Irvine, California.

25      68.    Toshiba America Electronic Components, Inc., markets SD Cards on behalf of

26  Toshiba Corporation in the United States from its California headquarters. For example, on

27  January 6, 2011, Toshiba America Electronic Components, Inc., issued a press release from its

28

INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1  Irvine headquarters announcing that it would be "on hand at International CES 2011 to

2  demonstrate the company's latest SD memory cards . . . ."

3      69.   SanDisk Corporation is headquartered in Milpitas, California.

4      70.   SanDisk describes itself as "the leading manufacturer or flash memory cards."

5  SanDisk is the largest manufacturer of SD Cards sold in the United States.

6      71.   Toshiba, SanDisk, and Panasonic conduct their joint licensing activity through SD-

7  3C LLC, and its agent in San Francisco, California.

8      72.   Companies who wish to manufacture SD Cards are required to join the SD

9  Association. The SD Association's bylaws provide that the principal office of the SD Association

10  shall be in California. The SD Association's "Contact Us" web page states that the SD

11  Association may be contacted "c/o Global Inventures, Inc." at 2400 Camino Ramon, Suite 375 in

12  San Ramon, California. The web page also lists California telephone number 1.925.275.6615 and

13  California facsimile number 1.925.886.4870. The SD-3C has delegated rights to sell or license

14  copyrighted materials (specifications) it owns to the SD Association, but those licenses, while at

15  *de minimis* costs, contain provisions and admissions highly favorable to the Cartel and the SD-3C.

16      73.   The SD Card License Agreement contains a California choice-of-law clause and a

17  California forum-selection clause.

18      74.   Defendants' licensing activities, and thus the conduct that forms the basis for each

19  and every class member's claims, emanated from California. Therefore, application of California

20  law to a nationwide class is appropriate.

21  ## CLASS ACTION ALLEGATIONS

22
23      75.   Plaintiffs bring this action on their own behalf and as a class action pursuant to

24  Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class

25  (the "Nationwide Class"):

26      All natural persons and entities residing in the United States that purchased
    in the United States for their own use and not for resale SD Cards during the

27      Class Period. Specifically excluded from this Class are the defendants; the
    officers, directors or employees of any defendant; any entity in which any

28      defendant has a controlling interest; and any affiliate, legal representative,

1    heir or assign of any defendant. Also excluded are any federal, state or
     local governmental entities, any judicial officer presiding over this action
2    and the members of his/her immediate family and judicial staff, and any
     juror assigned to this action.
3

4    76.    Plaintiffs also bring this action on their own behalf and as a class action pursuant to

5    Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

6    members of the following Class (the "California Class"):

7            All natural persons and entities residing in the United States that purchased
             in California for their own use and not for resale SD Cards during the Class
8            Period. Specifically excluded from this Class are the defendants; the
             officers, directors or employees of any defendant; any entity in which any
9            defendant has a controlling interest; and any affiliate, legal representative,
             heir or assign of any defendant. Also excluded are any federal, state or
10           local governmental entities, any judicial officer presiding over this action
             and the members of his/her immediate family and judicial staff, and any
11           juror assigned to this action.
12

13   77.    Plaintiffs do not know the exact size of the Classes at the present time. However,

14   Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least

15   thousands in each separate state class, and hundreds of thousands of class members geographically

16   dispersed throughout the United States, such that joinder of all class members would be

17   impracticable.

18   78.    Plaintiffs' claims are typical of the claims of the Classes, and Plaintiffs will fairly

19   and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and

20   not antagonistic to, those of the members of their respective Classes. Plaintiffs have retained

21   competent counsel experienced in class action and complex antitrust litigation.

22   79.    Common questions of law and fact exist, including:

23           g.    Whether Defendants and their co-conspirators engaged in a

24                 contract, combination or conspiracy among themselves to fix, raise,

25                 maintain or stabilize the process of, or allocate the markets for SD

26                 Cards, SD Card Intellectual Property, and NAND Flash Memory

27                 Intellectual Property sold in the United States;

28           h.    The duration and extent of the contract, combination or conspiracy;

                                              22

i.      Whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

j.      Whether Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of SD Cards, second generation SD Cards, SD Card Intellectual Property, and NAND Flash Memory Intellectual Property sold in and/or distributed in the United States;

k.      Whether Defendants and their co-conspirators engaged in conduct in violation of the antitrust, consumer protection, unfair trade, and/or deceptive trade practices laws of California as alleged below;

l.      Whether the anticompetitive conduct of Defendants and their co-conspirators caused prices of SD Cards to be artificially inflated to non-competitive levels;

m.      Whether Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Class(es);

n.      Whether Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

o.      Whether Plaintiffs and the Class(es) are entitled to injunctive relief; and

p.      Whether Plaintiffs and other members of the Class(es) were injured by the conduct of Defendants and, if so, the appropriate measure of damages for each of the Classes.

80.     These and other questions of law and fact are common to the Class(es) and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

23

1      81.     Class action treatment is a superior method for the fair and efficient adjudication of

2    this controversy because:

3                 a.      It will avoid a multiplicity of suits and consequent burden on the

4                         courts and Defendants;

5                 b.      It would be virtually impossible for all members of the Classes to

6                         intervene as parties-plaintiff in this action;

7                 c.      It will allow numerous individuals with claims too small to

8                         adjudicate on an individual basis because of the prohibitive cost of

9                         this litigation, to obtain redress for their economic injuries;

10                d.      It is appropriate for treatment on a fluid recovery basis, which

11                         obviate any manageability problems; and

12                e.      It will provide court oversight of the claims process, once

13                         Defendants' liability is adjudicated.

14      82.     The named Plaintiffs will fairly and adequately protect the interests of the Class(es)

15    in that the named Plaintiffs have no interests antagonistic to the interests of the other members of

16    the Classes and have retained counsel competent and experienced in the prosecution of class

17    actions and antitrust cases to represent themselves and the Class.

18      83.     This case is also appropriate for certification as a class action because Defendants

19    have acted and refused to act on grounds generally applicable to the Classes, so that final

20    injunctive relief will be appropriate with respect to the Class(es) as a whole.

21      84.     The claims asserted herein are also appropriate for class certification under the laws

22    of the state of California.

23                                **ACTIVE CONCEALMENT**

24      85.     Plaintiffs and members of the classes alleged herein did not discover and could not

25    have discovered, through the exercise of reasonable diligence, the existence of the conspiracy

26    alleged herein until no earlier than 2010, because Defendants and their co-conspirators actively

27    and fraudulently concealed the exact nature of their contract, combination or conspiracy.

28

1    86. As an example, the aforementioned facts regarding Defendants' refusal to deal and

2    conduct in licensing negotiations were not disclosed publicly until the filing of Samsung's

3    amended complaint in *Samsung Electronics Co., Ltd. v. Panasonic Corporation, et al.*, No 3:10-

4    cv-03098-JSW, on October 14, 2010. (Exhibit 1).

5    87. Because the nature of Defendants' agreement, understanding and conspiracy were

6    kept secret, Plaintiffs and members of the indirect-purchaser class(es) were unaware of

7    Defendants' unlawful conduct alleged herein and did not know that they were paying artificially

8    high prices for SD Cards.

9    88. Defendants' affirmative acts alleged herein, including acts in furtherance of the

10   conspiracy, were actively concealed and carried out in a manner that precluded detection. For

11   example, SD-3C required licensees to sign a Non-Disclosure Agreement, pursuant to which the

12   royalty terms of the SD Card License Agreement were confidential. As a result of Defendants'

13   active concealment of their conspiracy, the running of any statute of limitations has been tolled

14   with respect to any claims that Plaintiffs and the Class Members have as a result of the

15   anticompetitive conduct alleged in this Complaint.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act)

20   89. Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every

21   allegation set forth in the preceding paragraphs of this Complaint.

22   90. At least as early as August 29, 1999, and continuing through the filing of this

23   Complaint, the exact dates being unknown to plaintiffs, defendants and their co-conspirators

24   entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially

25   to fix, raise, stabilize, and control prices for SD Cards in the United States, thereby creating

26   anticompetitive effects that are not outweighed by countervailing precompetitive benefits. Such

27   conduct violates Section 1 of the Sherman Act (15 U.S.C. 1) and is actionable under the private

28   attorney general provisions for civil litigants under the Clayton Act.

91. These conspiratorial acts and combinations have caused unreasonable restraints in the markets for SD Cards, SD Card Intellectual Property and NAND Flash Memory Intellectual Property, without countervailing and offsetting benefits.

92. Plaintiffs and other similarly-situated indirect purchasers have been harmed by injury to competition to these markets by Defendants by being forced to pay inflated prices for SD Cards, SD Card Intellectual Property and deprived of advancements in NAND Flash Memory Intellectual Property that would provide for alternatives to SD Cards.

93. In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above.

94. The combination and conspiracy alleged herein has had the following effects, among others:

      f.     Price competition in the sale of SD Cards has been restrained, suppressed, and/or eliminated in the United States;

      g.     Prices for SD Cards sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

      h.     Those who purchased SD Cards indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

95. Plaintiffs and other Class Members have been injured and will continue to be injured in their businesses and property by paying more for SD Cards and purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

96. Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

1

## Second Claim for Relief

2

### (Violation of California Antitrust Laws)

3       97.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every

4    allegation set forth in the preceding paragraphs of this Complaint.

5       98.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January

6    1, 2000, and continuing thereafter at least up to the filing of this Complaint, Defendants and their

7    co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and

8    commerce described above in violation of Section 16720, California Business and Professions

9    Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise,

10    stabilize, and maintain prices of SD Cards at supra-competitive levels.

11       99.     The SD-3C and the Cartel members by colluding with each other have also fixed

12    the standards for removable NAND flash memory products for consumer devices, and captured

13    the markets for such removable NAND Flash Memory Intellectual Property as well as SD Cards

14    and SD Card Intellectual Property. Defendants, through their officers, directors and employees,

15    effectuated a contract, combination, trust, or conspiracy between themselves and their co-

16    conspirators by, among other things:

17                        i.      Participating in meetings and conversations to discuss the prices

18                                and supply of SD Cards in the United States;

19                        j.      Agreeing to fix the prices and limit the supply of SD Cards sold in

20                                the United States in a manner that deprived direct and indirect

21                                purchasers of free and open competition pursuant to the provisions

22                                governing royalty base in the 2006 license;

23                        k.      Issuing price announcements and quotations in accordance with the

24                                agreements reached;

25                        l.      Selling SD Cards to various customers in the United States at fixed,

26                                non-competitive prices;

27

28

27

| | | m. | Invoicing customers in the United States at the agreed-upon fixed |
| | | | prices for SD Cards and transmitting such invoices via U.S. mail |
| | | | and other interstate means of delivery; |

n.    Licensing separately the underlying technology for building the flash memory circuits (chips), controllers, and consumer devices;

o.    Refusing to disclose to licensees the specific identity of the patents in the SD-3C pool; and

p.    Effectively distorting competition in the NAND Flash Memory Intellectual Property Card market by making it impractical for memory device, card, and host consumer device makers to invest in and support alternative standards due to the cost of the SD Card implementation.

100. Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected within the State of California and nationwide from California, and Defendants' conduct within California injured all members of the Class throughout the United States.

As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the class have been injured in their business and property in that they paid more for SD Cards than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and the Class(es) seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Consumer Protection And Unfair Competition Laws)

101. Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

1    102.   Defendants' business acts and practices were centered in, carried out, effectuated,
2  and perfected mainly within the State of California, and Defendants' conduct injured all members
3  of the class.

4    103.   Beginning on a date unknown to California plaintiffs, but at least as early as
5  January 1, 2000, and continuing thereafter at least up through the filing of this Original Complaint,
6  Defendants committed and continue to commit acts of unfair competition, as defined by Sections
7  17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and
8  practices specified above.

9    104.   This claim is instituted pursuant to Sections 17203 and 17204 of the California
10  Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged
11  herein, that violated Section 17200 of the California Business and Professions Code, commonly
12  known as the Unfair Competition Law.

13    105.   Defendants' conduct as alleged herein violated Section 17200. The acts,
14  omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein,
15  constituted a common, continuous, and continuing course of conduct of unfair competition by
16  means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the
17  California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the
18  following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations
19  of Section 16720, *et seq*. of the California Business and Professions Code, as set forth above.

20    106.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as
21  described above, whether or not in violation of Section 16720, *et seq*., of the California Business
22  and Professions Code, and whether or not concerted or independent acts, are otherwise unfair,
23  unconscionable, unlawful or fraudulent.

24    107.   Defendants' acts or practices are unfair to consumers of SD Cards within the
25  meaning of Section 17200, California Business and Professions Code.

26    108.   Defendants' acts and practices are fraudulent or deceptive within the meaning of
27  Section 17200 of the California Business and Professions Code.

28

29

INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1    109.    Plaintiffs and the Class members are entitled to full restitution and/or disgorgement
2    of all revenues, earnings, profits, compensation, and benefits that may have been obtained by
3    defendants as a result of such business acts or practices.

4    110.    The illegal conduct alleged herein is continuing and there is no indication that
5    defendants will not continue such activity into the future.

6    111.    The unlawful and unfair business practices of defendants, and each of them, as
7    described above, has caused and continues to cause Plaintiffs and the members of the Class to pay
8    supra-competitive and artificially-inflated prices for SD Cards. Plaintiffs and members of the
9    Class suffered injury in fact and lost money or property as a result of such unfair competition.

10    112.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of
11    the California Business and Professions Code.

12    113.    As alleged in this Complaint, Defendants and their co-conspirators have been
13    unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition,
14    including overcharging and excluding other competitors from the relevant markets. Plaintiffs and
15    the members of the Class are accordingly entitled to equitable relief including restitution and/or
16    disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been
17    obtained by defendants as a result of such business practices, pursuant to the California Business
18    and Professions Code, Sections 17203 and 17204.

19    ## Fourth Claim for Relief

20    ## (Unjust Enrichment and Disgorgement of Profits)

21    114.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every
22    allegation set forth in the preceding paragraphs of this Complaint.

23    115.    Defendants have been unjustly enriched through overpayments by Plaintiffs and
24    class members and the resulting profits, and exclusion of development of alternative NAND Flash
25    Memory Technology from the markets.

26    116.    Under common law principles of unjust enrichment, Defendants should not be
27    permitted to retain the benefits conferred on them by overpayments by plaintiff and class
28    members.

30
INDIRECT-PURCHASER PLAINTIFFS' ORIGINAL COMPLAINT
Case No.

1    117.    Plaintiffs and class members seek disgorgement of all profits resulting from such

2    overpayments and establishment of a constructive trust from which plaintiff and class members

3    may seek restitution.

4                                    **PRAYER FOR RELIEF**

5             WHEREFORE, plaintiffs pray:

6        A.    That the Court determine that the Sherman Act, California antitrust law, and

7    California consumer protection and unfair competition law claims alleged herein may be

8    maintained as a class action, or class actions with or without sub-classes under Rules 23(a), (b)(2,

9    and (b)(3) of the Federal Rules of Civil Procedure, and as informed by the respective state class

10   action laws.

11       B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

12   adjudged and decreed to be:

13            1.    An unreasonable restraint of trade or commerce in violation of Section 1 of

14                 the Sherman Act by the combination, conspiracy and contracts of the

15                 Defendants.

16            2.    A *per se* violation of Section 1 of the Sherman Act by horizontal

17                 competitors (the Cartel) combining, conspiring and fixing prices for goods

18                 and Intellectual Property where they would otherwise compete on price.

19            3.    Acts of unjust enrichment as set forth herein by all Defendants;

20            4.    An unlawful combination, trust, agreement, understanding, and/or concert

21                 of action in violation of the California antitrust laws as set forth herein by

22                 all Defendants; and

23            5.    Violations of the California consumer protection and unfair competition

24                 laws as set forth herein by all Defendants.

25       C.    That Plaintiffs and members of the Classes alleged herein recover damages, to the

26   maximum extent allowed under such laws as provided by California antitrust laws, and that a joint

27   and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an

28   amount to be trebled to the extent permitted by such laws;

1    D.    That Plaintiffs and members of the Classes alleged herein recover damages, to the

2  maximum extent allowed by California consumer protection laws in the form of restitution and/or

3  disgorgement of profits illegally gained from them.

4    E.    That Defendants, their affiliates, successors, transferees, assignees, and the officers,

5  directors, partners, agents, and employees thereof, and all other persons acting or claiming to act

6  on their behalf or in concert with them, be permanently enjoined and restrained from in any

7  manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination

8  alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any

9  other contract, conspiracy or combination having a similar purpose or effect, and from adopting or

10  following any practice, plan, program, or device having a similar purpose or effect;

11    F.    That the Court enter an order of divestiture requiring Defendants to rescind and/or

12  dissolve the cooperation agreements, joint ventures and/or cross-license agreements alleged herein

13  between and among them used to facilitate the conspiracy alleged herein;

14    G.    That Plaintiffs and members of the Class(es) alleged herein be awarded restitution,

15  including disgorgement of profits obtained by Defendants as a result of their acts of unfair

16  competition and acts of unjust enrichment;

17    H.    That Plaintiffs and members of the Class(es) alleged herein be awarded pre- and

18  post-judgment interest as provided by law, and that such interest be awarded at the highest legal

19  rate from and after the date of service of the initial complaint in this action;

20    I.    That Plaintiffs and members of the Class(es) alleged herein recover their costs of

21  suit, including a reasonable attorney's fee, as provided by law; and

22    J.    That Plaintiffs and members of the Class(es) alleged herein have such other,

23  further, and different relief as the case may require and the Court may deem just and proper under

24  the circumstances.

25  ///

26  ///

27  ///

28  ///

32

Dated: March 15, 2011

Max L. Tribble Jr.
mtribble@susmangodfrey.com
Joseph S. Grinstein
jgrinste@susmangodfrey.com
Eric J. Mayer
emayer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666

David J. Healey
healey@fr.com
Ana E. Kadala
kadala@fr.com
FISH & RICHARDSON P.C.
One Houston Center, Suite 2800
1221 McKinney St.
Houston, Texas 77010
Telephone 713-654-5300
Facsimile 713-652-0109

Michael J. Kane
kane@fr.com
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone 612-335-5070
Facsimile 612-288-9696

Jay P. Smith III
jay.smith@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street NE
21st Floor
Atlanta, GA 30309
Telephone 404-892-5005
Facsimile 404-892-5002

John M. Farrell
jfarrell@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street
Suite 500
Redwood City, CA 94063
Telephone 650-839-5070
Facsimile 650-839-5071

33

1

## DEMAND FOR JURY TRIAL

2       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial

3   by Jury.

4   Dated: March 15, 2011

5

6                           John M. Farrell
                            jfarrell@fr.com
7                           FISH & RICHARDSON P.C.
                            500 Arguello Street
8                           Suite 500
                            Redwood City, CA 94063
9                           Telephone 650-839-5070
                            Facsimile 650-839-5071

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

SIMON J. FRANKEL (Bar No. 171552)
EVAN R. COX (Bar No. 133229)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111
Telephone:   (415) 591-6000
Facsimile:    (415) 591-6091
Email:         sfrankel@cov.com
                   ecox@cov.com

TIMOTHY C. HESTER*
DEREK LUDWIN*
JONATHAN GIMBLETT*
MONIQUE M. O'DONOGHUE*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone:   (202) 662-6000
Facsimile:    (202) 662-6291
Email:         thester@cov.com
* admitted pro hac vice
Attorneys for Plaintiff
SAMSUNG ELECTRONICS CO., LTD

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>Plaintiff,<br><br>v.<br><br>PANASONIC CORPORATION, a Japanese corporation; PANASONIC CORPORATION OF NORTH AMERICA, a Delaware corporation; and SD-3C LLC, a Delaware limited liability company.<br><br>Defendants. | Case No. 10-3098 JSW<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Samsung Electronics Co., Ltd. ("Samsung"), by its attorneys, brings this

2  action for damages, a declaratory judgment and injunctive relief, against Defendants Panasonic

3  Corporation, Panasonic Corporation of North America (collectively "Panasonic") and SD-3C

4  LLC ("SD-3C") (together with Panasonic, "Defendants"). Samsung alleges as follows:

5                                          **INTRODUCTION**

6        1.    Three major competitors in critical markets for products and technology

7  have entered into an illegal and ongoing combination, the purpose and effect of which is to give

8  themselves a permanent advantage that injures both competition and consumers. They usurped

9  the work of an open standard-setting organization in order to establish their own proprietary

10  standard that artificially requires other industry participants to use technology owned by them.

11  Through their combination, they now exploit control of this manipulated standard to raise their

12  competitors' costs, to discourage competing innovations, and to seek to stabilize prices across

13  the industry. While claiming to have engaged in legitimate standard-setting and licensing

14  activities, they are, in effect, a disguised cartel.

15        2.    The Secure Digital Memory Card ("SD Card") is a high-speed flash

16  memory card incorporating certain security features. SD Cards have become the dominant

17  format in the flash memory card industry and are widely used in digital cameras, mobile

18  telephones and other electronic devices purchased by U.S. consumers. Panasonic, SanDisk and

19  Toshiba (collectively, the "SD Group members") claim to own technology essential to the

20  manufacture of SD Cards. Through their jointly-owned and -controlled affiliate, SD-3C, these

21  companies require every new entrant into the SD Card market to secure from SD-3C an SD

22  Memory Card License Agreement ("SD Card License"). By means of this license, and on terms

23  agreed between Defendants, SanDisk and Toshiba, the SD Group members continue to impose

24  on new and prospective manufacturers and sellers of SD Cards what amounts to an "entry fee"

25  that raises the costs of competing SD Card manufacturers and causes ongoing harm to new and

26  current sellers and manufacturers of SD Cards. The SD Card License also contains unequal

27  grantback provisions that have the effect of reducing the incentives of competitors to develop

28  their own alternative SD Card technologies. As the SD Card standard has gained broader

- 1 -

FIRST AMENDED COMPLAINT                                                    Case No. 10-3098 JSW

1  market acceptance, Panasonic and the other SD Group members, working through SD-3C, have
2  sought to exploit their control of purportedly essential SD Card technology to impose
3  increasingly onerous and anticompetitive terms on potential licensees, including—through
4  active efforts by SD-3C in 2007 and more recently—terms that would have the effect of placing
5  a floor on SD Card prices.

6      3.      Although purporting to operate like a patent pool, the licensing
7  arrangements among Defendants and the other SD Group members generate none of the
8  procompetitive benefits that might otherwise justify an agreement among horizontal competitors
9  to combine their patent rights and license them out at a single price. Because Panasonic,
10  SanDisk and Toshiba have withheld critical patent rights from the pool, the SD Card License
11  does not offer licensees the efficiency of being able to obtain all of the rights owned by the SD
12  Group members needed to manufacture SD Cards. Moreover, notwithstanding illusory
13  disclaimers to the contrary in recent versions of the SD Card License, Panasonic and the other
14  SD Group members do not offer industry participants any alternative to executing the SD Card
15  License—with its built-in "entry fee"—in order to manufacture SD Cards.

16      4.      Nor are Defendants and the other SD Group members engaged in a
17  legitimate form of standard-setting. The agreements among three major competitors to replace
18  an existing open standard format with the SD Card and then to jointly license their rights to that
19  card at a single price cannot be justified on efficiency grounds. Panasonic, SanDisk and
20  Toshiba initially agreed to develop the SD Card in August 1999. At that time SanDisk was a
21  member of the MultimediaCard Association ("MMCA"), an open standard-setting process with
22  numerous other industry participants that was working to develop a MultimediaCard ("MMC")
23  standard based on a format originally developed by SanDisk. The MMCA was fully capable of
24  developing an upgraded version of the MMC format that would incorporate the limited number
25  of incremental features of the SD Card format. Panasonic, SanDisk and Toshiba bypassed that
26  open standard-setting process when they—as three leading competitors in the market—entered
27  into an agreement among themselves to devise a modification of the existing MMC
28  specification to serve as the first version of the SD Card specification. Having excluded the

- 2 -

FIRST AMENDED COMPLAINT                                              Case No. 10-3098 JSW

1   other MMCA member companies from their deliberations, the SD Group members then

2   manipulated the SD Card specification to ensure that it arbitrarily required the use of patent

3   rights owned by SD Group members. The agreement between Panasonic, SanDisk and Toshiba

4   to alter the MMC specification outside of the MMCA did not produce material procompetitive

5   efficiencies in the development of a standard for a high-speed secure flash memory card.

6   Instead, it served instead as the means by which these companies, acting in concert with SD-3C,

7   could secure for themselves a dominant market position. The anticompetitive agreements and

8   conduct of Defendants, SanDisk and Toshiba that are the subject of this complaint seek to

9   maintain and exploit that unlawfully acquired dominance.

10         5.     The agreements between Defendants, SanDisk and Toshiba violate

11   Sections 1 and 2 of the Sherman Act. They violate Section 1 because they are agreements

12   between competitors that suppress competition and that create anticompetitive effects that are

13   not outweighed by countervailing procompetitive benefits. They violate Section 2 of the

14   Sherman Act because the agreements constitute a conspiracy to monopolize the market for SD

15   Card technology. That conspiracy has resulted in the unlawful acquisition and maintenance by

16   SD-3C, acting on behalf of the members of the SD Group, of a monopoly in the market for SD

17   Card technology—a further violation of Section 2. In addition, Defendants have engaged in

18   patent misuse by demanding royalties on the sale of unlicensed memory under the SD Card

19   license and have violated both the Cartwright Act and Section 17200 of the California Business

20   and Professions Code.

21         6.     As a licensee, manufacturer, and supplier of SD Card components and

22   finished SD Cards, Samsung has been repeatedly injured by its and its customers' ongoing

23   inability to avoid the anticompetitive terms of the SD-3C licensing regime, and more generally

24   the effects of the illegal combination. Samsung is dependent both on its own ability and its

25   customers' ability to compete effectively in the SD Card and related markets. The efforts by

26   SD-3C and the SD Group members, including the new and affirmative steps taken in September

27   2006 and more recently, to control the markets for SD Cards and related products and

28   technologies undermines, on an ongoing basis, the ability of Samsung and its customers to

- 3 -

FIRST AMENDED COMPLAINT                             Case No. 10-3098 JSW

1  compete. Samsung continues to suffer injury as a result of Defendants' violations of federal and
2  state law.

3  **THE PARTIES**

4      7.    Plaintiff Samsung Electronics Co., Ltd. is a corporation organized under
5  the laws of the Republic of Korea with its principal place of business at 416 Maetan-dong,
6  Youngtong-gu, Suwon, Kyunggi-Do, 443-742, Korea.

7      8.    Defendant Panasonic Corporation is a Japanese corporation, with its
8  headquarters at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Prior to October
9  2008, Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd.

10      9.    Defendant Panasonic Corporation of North America ("PNA"), a Delaware
11  corporation, is, upon information and belief, a wholly owned subsidiary of Panasonic
12  Corporation, with its principal place of business at One Panasonic Way, Seacacus, New Jersey
13  07094, and is doing business in this district.

14      10.    Defendant SD-3C LLC is a Delaware limited liability company with its
15  principal place of business at 180 Montgomery Street, Suite 1840, San Francisco, California
16  94104. On information and belief, SD-3C has conducted licensing activities through its agent,
17  Miller, Kaplan, Arase & Co. LLP, at that address.

18  **JURISDICTION AND VENUE**

19      11.    This Court has subject matter jurisdiction over this action under 28 U.S.C.
20  §§ 1331, 1337(a), and 1367, insofar as Samsung seeks declaratory relief addressing issues
21  arising under federal patent and antitrust law and asserts claims of violations of the Sherman
22  Act. The Court has also jurisdiction under 28 U.S.C. § 1332, in that the matter in controversy is
23  between a citizen of a foreign state and citizens of a state, and the amount in controversy,
24  exclusive of interest and costs, exceeds $75,000. The Court may grant declaratory relief in this
25  action pursuant to 28 U.S.C. §§ 2201 and 2202.

26      12.    A substantial part of the events or omissions giving rise to this Complaint
27  occurred in this District. Upon information and belief, SD-3C transacts business in this District,
28  both directly and through its agent, and is subject to personal jurisdiction in this District.

- 4 -

1  Furthermore, SD-3C has consented to venue in this District. As such, venue is proper in this

2  Court pursuant to 28 U.S.C. §§ 1391 and 1400 and 15 U.S.C. § 22.

3  **INTRA-DISTRICT ASSIGNMENT**

4            13.    The SD Group members established SD-3C with its principal place of

5  business in San Francisco County, where a substantial part of the events or omissions giving rise

6  to this action occurred. Pursuant to Local Rule 3-2(d), "all civil actions which arise in the

7  count[y] of . . San Francisco . . . shall be assigned to the San Francisco Division or the Oakland

8  Division." Therefore, assignment to the San Francisco Division of this Court is appropriate.

9  **FACTUAL ALLEGATIONS**

10           14.    Since their initial development in the late 1980s, flash memory cards have

11  become a key ingredient in the modern information economy, facilitating the storage of

12  constantly increasing amounts of information on ever-smaller devices. Vigorous competition

13  between different technologies and flash card manufacturers during the 1990s helped drive rapid

14  product improvements and steadily declining prices. This complaint relates to the

15  anticompetitive and ongoing agreements arising from the decision of three leading producers of

16  flash memory cards to cease competing with each other and, instead, to seek and maintain

17  market dominance through agreements on future product specifications and royalties charged to

18  the industry. This conduct has raised rivals' costs and given the conspirators a permanent cost

19  advantage. These anticompetitive and ongoing arrangements do not reflect either legitimate

20  patent-pooling or standard-setting activities and restrict competition in technology and product

21  markets. These efforts harm, and will continue to harm, both Samsung and competition more

22  generally.

23       **A.    Background on the Technologies and Products at Issue in this Case**

24            **1.    Flash Memory**

25            15.    Flash memory was developed in the early 1980s by Toshiba and is now

26  widely used in consumer electronics devices, either as embedded memory within devices or in

27  the form of flash memory cards that can be slotted into and communicate with those devices.

28

-5-

FIRST AMENDED COMPLAINT                                                           Case No. 10-3098 JSW

1         16.    One of the distinctive features of flash memory is that it is non-volatile,

2  meaning that it can retain data without a continuous power source, unlike the Dynamic Random

3  Access Memory ("DRAM") traditionally used in computer hard drives. Flash memory is also

4  solid state, meaning that it contains no moving parts and is therefore shock-resistant. An

5  additional advantage of flash memory is that it can be read and programmed faster than many

6  other types of memory.

7         17.    These qualities have helped flash memory become the dominant

8  technology for storing data in numerous types of consumer electronic devices, including digital

9  cameras, digital audio players and cellular telephones. Flash memory is a critical component in

10  such commercially successful products as the iPod and the iPhone. It is also increasingly used

11  in solid state hard drives for personal computers.

12        18.    The two main types of flash memory are NOR and NAND. In NOR flash

13  memory, the memory cells are arranged in parallel. Because this architecture permits random

14  access to data, NOR flash is well-suited for programming applications, such as code storage and

15  execution. In NAND flash memory, the cells are arranged in series. While this architecture

16  prevents random access to data, it allows for significantly faster write and erase operations and a

17  higher storage density than NOR. These characteristics make NAND the preferred form of flash

18  memory for use in data storage applications. Accordingly, the flash memory used in consumer

19  electronic devices is almost exclusively NAND.

20        19.    Panasonic, Toshiba and SanDisk each claim patent rights bearing on

21  NAND flash memory technology. Each of them also demands royalties from other

22  manufacturers of NAND flash memory based on these rights.

23        **2.    Flash Memory Cards**

24        20.    A significant proportion of NAND flash memory reaches consumers

25  already built into (or "embedded" in) digital devices. Approximately 40-50 percent of NAND

26  flash memory output, however, is sold in the form of flash memory cards. Flash memory cards

27  are portable data storage media that can be inserted directly into compatible slots on host

28  devices such as laptop computers, digital cameras, and mobile phones. Flash memory cards

- 6 -

FIRST AMENDED COMPLAINT                    Case No. 10-3098 JSW

typically combine a flash memory chip with a "controller" (a chip that manages read, write and erase instructions received from the host device), packaged together in a plastic casing. Because of its higher density, NAND flash memory is particularly well-suited for use in flash memory cards, and the vast majority of flash memory cards in use today incorporate NAND flash memory chips.

21.     Flash memory chips, the key component of SD Cards, are made in large, specialized manufacturing facilities (commonly known as "fabs") by manufacturers that include Toshiba, SanDisk (through a joint venture with Toshiba) and Samsung. The chips are combined with other components to form SD Cards in a separate manufacturing process, either by the memory manufacturer itself, or by a manufacturer or an assembler to which the memory manufacturer sells its chips. Panasonic, Toshiba, SanDisk and Samsung all manufacture flash memory cards. Examples of smaller manufacturers and assemblers include Lexar, A-Data, Apacer, Corsair Microsystems, Dane-Elec, Kingston, PNY, PQI, Transcend, TSR, Buffalo and Phison Electronics.

22.     Samsung is a manufacturer of both flash memory chips and finished SD Cards. Samsung sells flash memory chips to assemblers who combine the chips with other components to form SD Cards. Samsung sells, or has sold, flash memory chips to a variety of manufacturers and assemblers, including Kingston, PQI, Transcend and A-Data. Samsung also incorporates the flash memory chips into finished SD Cards that Samsung then sells to third-parties, which include or have included companies such as Lexar, PNY and Memorex, to sell under their own brand name. Samsung also sells SD Cards directly to device manufacturers, such as Nokia and RIM, for use in their devices.

23.     A given flash memory card can be used only in host devices that have a compatible slot corresponding to that card's "form factor" (the size and shape of the card) and appropriate "driver" software (also called host interface software) to allow the host device to communicate with the memory card. Without the appropriate driver software, an otherwise physically compatible card (i.e., a card that physically fits into a slot in the host device) may not work properly in that device.

- 7 -

FIRST AMENDED COMPLAINT                                                              Case No. 10-3098 JSW

1  **B. Background on the Means By Which Panasonic, SanDisk and Toshiba Gained the Dominant Position That They Now Seek to Maintain and Exploit.**

2

3  **1. Competition in the Flash Memory Card Industry in the 1990s**

4      24.    The development of flash memory cards since they first appeared in the

5  late 1980s has been affected by two overarching factors. First, flash memory card

6  manufacturers have had to innovate constantly to achieve the smaller form factors, faster

7  processing times, and increased data storage capacities required by design improvements in host

8  devices (for example, the development of smaller, higher resolution digital cameras). Second,

9  because consumers value the convenience of being able to use the same flash memory card

10  format in different host devices, flash memory card manufacturers have an incentive to promote

11  broad acceptance of their own formats. During the 1990s, these two factors fostered vigorous

12  technological competition among flash memory card manufacturers, reflected in the release of

13  numerous competing card formats, accompanied by efforts by individual manufacturers to

14  promote industry-wide adoption of their own formats as open standards.

15      25.    The first flash memory cards were generally proprietary designs, such that

16  each one worked only with that manufacturer's products. By the late 1980s, the industry

17  recognized that in order to advance the acceptance and use of flash memory cards it was

18  necessary to standardize the flash card formats. Accordingly, in 1989, 25 vendors joined

19  together to form a non-profit, open standards organization called PCMCIA (Personal Computer

20  Memory Card International Association) to develop a universal memory card format for laptop

21  computers.

22      26.    The PCMCIA developed a set of protocols describing the form factor and

23  operating characteristics of a NOR-based flash memory card format called the PC Card. The

24  first PC Card specification was published in 1990. The PC Card was an open standard. As an

25  open standard, no company controlled the PC Card format and multiple vendors competed to

26  supply the market with interoperable memory cards that complied with the format.

27      27.    During the mid-1990s, the major flash memory card manufacturers

28  competed to develop smaller memory card formats and to have those formats adopted as open

- 8 -

FIRST AMENDED COMPLAINT                                              Case No. 10-3098 JSW

1 standards by other manufacturers. Panasonic, Toshiba and SanDisk were prominent horizontal

2 competitors at this time, each developing and promoting new formats of their own.

3        28. In 1994, SanDisk developed the CompactFlash format, a NOR-based flash

4 memory card with a smaller form factor than the PC Card but that could be used in a PC Card

5 slot by means of an adapter. To promote the card as a standard, SanDisk agreed to transfer its

6 Compact Flash trademark and technical specifications to the CompactFlash Association, an

7 open standard-setting body, which made the specifications available under a royalty-free license

8 to other third-party manufacturers that committed to develop, manufacture and supply

9 CompactFlash products.

10        29. In 1995, Toshiba launched the SmartMedia format, a small NAND-based

11 flash memory card format with no on-board controller, which it proposed as a standard. The

12 SmartMedia Format was promoted as an open, royalty-free standard by the SSFDC (Solid State

13 Floppy Disk Card) Forum.

14        30. In 1997, Panasonic announced its own NAND-based flash memory card,

15 the Mega Storage Device, previously known in Japan as the SmallPC Card, to target digital

16 cameras, personal digital assistants, and other portable devices.

17        31. Also in 1997, Siemens and SanDisk jointly developed and introduced the

18 MultiMediaCard ("MMC Card") specification, a high-density NAND-based flash memory card

19 format, with a form factor about the size of a postage stamp. The development of the MMC

20 Card was encouraged by Nokia, which wanted a smaller form factor memory card for use in

21 cellular telephones. Nokia encouraged the MMC Card as an open standard.

22        32. In 1998, Siemens, SanDisk and twelve other companies announced the

23 establishment of the MultiMediaCard Association ("MMCA") "to make the MultiMediaCard a

24 broadly supported new industry standard." The MMCA had two types of members, executive

25 and affiliate. At its inception, executive members were asked to pay a modest fee of $5,000 to

26 join—and to have full voting rights—while affiliate members were asked to pay only $2,500.

27 All MMCA members were entitled to access and use the MultiMediaCard specification to

28 develop, manufacture and supply MultiMediaCard products on a royalty-free basis. All

- 9 -

FIRST AMENDED COMPLAINT                                        Case No. 10-3098 JSW

1    executive members were entitled to participate on an equal basis in the development of

2    specifications and standards. Samsung joined the MMCA in 2002 as an executive member and

3    began manufacturing MMC cards at that time. Samsung ceased taking orders for MMC cards in

4    2006.

5                    33.    SanDisk's 1998 SEC Annual Report commented on the "intense

6    competition, rapid technological change [and] evolving industry standards" that characterized

7    the flash memory card market at that time. The report identified both Toshiba and Panasonic as

8    horizontal competitors in the development of flash memory cards and flash memory card

9    technology, observing that:

10                       Competing products promoting industry standards that are
                         different from SanDisk's have been introduced, including Intel's
11                       Miniature Card, Toshiba's Smart Media (Solid-State Floppy Disk
                         Card), Sony Corporation's Memory Stick, and Panasonic's
12                       recently introduced Mega Storage cards . . . .

13

14                   34.    SanDisk's annual report specifically noted that "our MultiMediaCard

15   products are expected to face stiff competition from Toshiba's SmartMedia flash cards" together

16   with Sony's Memory Stick.

17                   35.    But by the time SanDisk released its next annual report, covering the 1999

18   calendar year, the company had embarked on a course of action in concert with Panasonic and

19   Toshiba that was to alter and fundamentally reduce competition in the flash memory card

20   industry.

21              **2.    Panasonic, SanDisk and Toshiba Launch Their Initial Joint
                        Activities.**
22

23                   36.    Prior to 1999, Panasonic, SanDisk and Toshiba were major horizontal

24   competitors in the flash memory card technology and product markets. Each of these

25   companies had supported open standard-setting as a means of gaining a competitive edge for

26   their formats. Prior to 1999, open standard-setting was the norm in the flash memory card

27   industry for manufacturers that wished to promote broader adoption of a particular format

28   among different host manufacturers. While some single-company proprietary formats, such as

                                                - 10 -

FIRST AMENDED COMPLAINT                                              Case No. 10-3098 JSW

1    Sony's Memory Stick, had enjoyed limited commercial success, competitor collaborations to

2    promote a jointly-owned proprietary standard were highly unusual.

3              37.    On August 25, 1999, Panasonic revealed that it was working with SanDisk

4    and Toshiba pursuant to an agreement that marked a radical departure from the competitive

5    norms underpinning the development of the industry over the previous decade. Under this

6    agreement, the three major competitors agreed to develop a modified version of the MMC Card

7    in a closed process from which other industry participants were excluded.

8              38.    As described in SanDisk's 1999 SEC Annual Report, the agreement

9    announced in August 1999 was:

10              [A] memorandum of understanding under which we, [Panasonic]
                and Toshiba will jointly develop and promote a next generation
11              flash memory card called the Secure Digital Memory Card. The
                Secure Digital Memory Card is an enhanced version of our
12              MultiMediaCard that will incorporate advanced security and
                copyright protection features . . . .
13

14    SanDisk further stated that it had:

15              joined forces with [Panasonic] . . . and Toshiba to jointly develop,
                specify, and promote the Secure Digital Memory Card [and] [a]s
16              part of this collaboration, all three companies [would] foster the
                development of application products using the Secure Digital
17              Memory Card.

18              39.    SanDisk was a founding member of the MMCA, an open standard-setting

19    organization that had as its mission "to encourage all interested members of industry to join in

20    the development and marketing of MultiMediaCard-based technologies." As such, the MMCA

21    was the natural forum for any development work on an enhanced version of the

22    MultiMediaCard. There was nothing about the additional functionality that the SD Group

23    members incorporated into the SD Card that would have prevented the MMCA from achieving

24    the same result under its open standard-setting rules. The combination of Panasonic, SanDisk

25    and Toshiba—three major horizontal competitors—did not create efficiencies that could not

26    have been achieved in a manner that preserved competition among these companies. Instead,

27    this combination of competitors, created in secret, stymied the existing standard-setting process,

28    and has permitted Panasonic, SanDisk and Toshiba, with SD-3C, to suppress competition to

- 11 -

1  their benefit and without the procompetitive efficiencies that flow from legitimate standard-

2  setting activities. There are significant ongoing anticompetitive effects caused by this conduct,

3  and by the more recent activities of these three horizontal competitors.

4        40.   Indeed, SanDisk's 1999 SEC Annual Report expressly acknowledged that

5  Panasonic, SanDisk and Toshiba were not uniquely qualified to bring this additional

6  functionality to the marketplace. The annual report observed that "Hitachi, Infineon, Sanyo and

7  Fujitsu have proposed their Secure MultiMediaCard which provides the copy protection

8  function that is included on our Secure Digital Memory Card."

9        41.   On information and belief, Panasonic encouraged SanDisk to join with it

10  and Toshiba in developing the SD Card outside of the MMCA structure. In addition to being a

11  significant horizontal competitor of SanDisk and Toshiba, as a manufacturer of flash memory

12  cards, Panasonic was (like Toshiba) also a major manufacturer (through Panasonic Corporation)

13  and seller (through PNA) of host devices, and was therefore well-placed to push for adoption of

14  the new format by the consumer electronics industry. The SD Group members induced other

15  manufacturers of host devices to adopt the SD Card format by offering them royalty-free

16  licenses to incorporate SD Card functionality into their products (in contrast to the

17  anticompetitive entry fee later charged to SD Card manufacturers, as described below) and by

18  promising to make SD Cards backwardly compatible with the MMC format.

19        42.   As further described below, by combining their respective market weights,

20  Panasonic, SanDisk and Toshiba could thus achieve critical mass for the new format under rules

21  of their own choosing, without having to resort to open standard-setting. As an official of

22  SanDisk, then the largest manufacturer of flash memory cards in the world, stated at the time:

23  "The combination of these three firms gives strength. That's why they came to SanDisk."

24        **3.**   **Panasonic, SanDisk and Toshiba Agree to Evade the Even-Handed
            Protections of Open Standard-Setting.**

25

26        43.   If Panasonic, SanDisk and Toshiba had chosen to proceed within the

27  MMCA, their standard-setting activity would have been subject to the MMCA Policies and

28  Procedures (the "MMCA Policies"). Under the MMCA Policies, the SD Group members would

- 12 -

FIRST AMENDED COMPLAINT                        Case No. 10-3098 JSW

1  have been required to circulate to other members a request for approval to proceed with a

2  change to the MMCA Standard, and the change would then have been considered and approved

3  by the relevant technical committee of the MMCA and subsequently by the MMCA Board of

4  Directors. In furtherance of their long-term anticompetitive goals, the SD Group members

5  deliberately evaded such an open process.

6        44.  In addition, the SD Group members would have been subject to the

7  MMCA's disclosure and licensing policy on intellectual property. That policy would have

8  required disclosure to the group of any patent rights covered by the SD Group members'

9  proposal. The MMCA's rules provided:

10        When considering whether proprietary technology should be
11        included, the Association balances the benefits of such
      technology with the burden of compliance with licensing
12        requirements. As such, it is essential to the Association's
      success that it be fully informed of the existence of proprietary
13        technology in any proposal for inclusion in the specification,
      at the first showing of that proposal in an Association meeting.
14

15        Any party submitting a proposal for inclusion in the
      specification will be required to disclose, at the time of
16        submittal, all known proprietary technology included in the
      submission. . . . The Association expects that the proposal
17        sponsor will use reasonable diligence to determine if
      proprietary technology is included in the proposal. Failure to
18        use reasonable diligence or make this disclosure is grounds for
      expulsion from the Association.
19

20        45.  Such disclosure would have allowed the MMCA members to assess the

21  potential licensing costs associated with the new proposal, secure non-discriminatory licensing

22  commitments, and take into account their policy preference for technologies that can be licensed

23  royalty free or on reasonable terms, according to which:

24        [T]he Association will only include a member company's
      proprietary technology in it's [sic] specification if the owner of
25        that technology agrees to reasonable and nondiscriminatory
26        licensing terms set forth below.

27  Rather than work within these constraints and submit the development of the SD Card to the

28  MMCA, however, Panasonic, SanDisk and Toshiba agreed to combine among themselves

- 13 -

FIRST AMENDED COMPLAINT                        Case No. 10-3098 JSW

1   outside of the standard-setting process. The effect and necessary purpose of the steps taken by

2   these three major competitors to subvert and bypass the open standard-setting work of the

3   MMCA was to establish a proprietary standard that they themselves could dominate. Freed

4   from the MMCA's even-handed rules and patent disclosure and licensing policies, and working

5   instead as a combination of competitors, the SD Group members have put in place and (with

6   SD-3C) continue to enforce a regime for the SD Card that is designed to maintain and exploit

7   that dominance.

8                   **4.      The SD Group Members' Manipulation of the SD Card Specification**

9            46.     Panasonic, SanDisk and Toshiba issued the first version of the SD Card

10  specification (the "Specification") in March 2000.

11           47.     The SD Group members' approach to the Specification represented a

12  radical departure from the previous practice in the flash memory card industry, reflected by such

13  open standards organizations as the CompactFlash Association and MMCA. During the 1990s,

14  SanDisk and other manufacturers had encouraged industry-wide adoption of formats they had

15  already developed by allowing competitors to implement the corresponding specification on a

16  royalty-free basis. The August 1999 agreement among Panasonic, SanDisk and Toshiba, by

17  contrast, implemented arbitrary amendments to the existing MMC specification that the three

18  companies subsequently would share only with memory card manufacturers that promised to

19  pay a hefty royalty and subject themselves to the other restrictions imposed by the SD Group

20  members.

21           48.     By choosing to agree among themselves on the Specification without

22  inviting input from or making disclosure to other parties, the SD Group members ignored

23  guidance addressed to, among others, Panasonic and Toshiba by the U.S. Department of Justice

24  ("the DOJ") in a business review letter of June 10, 1999 related to DVD licensing practices.

25  That letter described the potential anticompetitive nature of the inclusion in patent pools of non-

26  essential patents. In view of the economic incentive that collaborating licensors have "to

27  combine in the pool their competing . . . patents and to foreclose others' competing patents," the

28  DOJ stressed the importance of engaging a genuinely independent expert "to undertake a

- 14 -

1  disinterested review of the 'essentiality' of the patent rights put forward." The DOJ's letter also
2  warned that inclusion in a pool of one of several competing non-essential patents could
3  "unreasonably foreclose the non-included competing patents from use by manufacturers."

4        49.    Defendants failed to comply with the DOJ guidance in several ways. By
5  excluding other companies from their deliberations, and by failing to engage an independent
6  expert, the SD Group members were able to craft a Specification that, to this day, favors their
7  own intellectual property rights and fails to ensure a "pool" limited to essential patents. The SD
8  Group members did this by drafting the Specification to mandate particular technological
9  solutions for certain new features that could have been left to the discretion of the manufacturer
10  without affecting the core functionality of the card. Members of the SD Group then filed patent
11  applications to cover the mandated solutions.

12        50.    For example, SD-3C asserts that the Specification cannot be implemented
13  without infringing two Panasonic patents covering a mechanical write protect switch that
14  prevents consumers from accidentally overwriting the card and destroying data, images or
15  audio. Those patents derive from applications first filed by Panasonic on August 6 and 24,
16  1999—contemporaneously with Panasonic's agreement with the SD Group members and
17  immediately before the SD Group members' first public announcement on August 25, 1999 that
18  they were collaborating on the creation of an SD Card. There was no sound reason to require
19  the practice of Panasonic's technology in this way. To the contrary, the SD Group members
20  could have written the Specification so as to allow mechanical write protection to be
21  implemented by a variety of means. By unnecessarily including in its "pool" a write protection
22  technology owned by one of its members, the SD Group members unreasonably foreclosed
23  choice in the use of alternatives by manufacturers.

24        51.    As a result of the arbitrary and self-interested way in which Panasonic and
25  the other SD Group members have created a Specification that requires the practice of their own
26  patents to implement non-essential features, alternative technologies for implementing such
27  features in a more cost-effective manner have been restrained. By writing a Specification that
28  artificially rendered their own patents "essential," the SD Group members also created the basis

- 15 -

1  for a licensing scheme that now effectively insulates the SD Group members from competition.

## 5. The Unequal Rules Imposed by the SD Group Members on the SD Association

4  52.  The SD Group members announced the establishment of the SD
5  Association ("SDA") on January 6, 2000, at a joint press conference at the Consumer
6  Electronics Show in Las Vegas. The SD Group members required, as a condition of
7  membership in the SDA, that companies agree to observe association rules designed by the SD
8  Group members. The SDA was created, and has been controlled and supported by the SD
9  Group members, in furtherance of their proprietary standard and ongoing combination. PNA,
10 for example, hosted the SDA website without charge until 2007 as part of this combination.

11 53.  As described below, these rules had the effect of entrenching the SD Group
12 members' own dominant position within the organization, and supporting its ability to maintain
13 a dominant position in the SD Card and related markets. In particular, the SD Group members
14 set up, and have maintained through their control and support, an Intellectual Property Policy
15 (the "IP Policy") structure for the SDA that now assists them in hiding the nature of the putative
16 "essential" patents and furthers their ability to license these patents only through SD-3C and at a
17 single price.

18 54.  The IP Policy created by the SD Group members is unlike the policy of the
19 MMCA or those of other legitimate standard-setting bodies. The SDA IP Policy requires
20 disclosure of relevant intellectual property rights by some, but not all, of the members.
21 Members who are subject to the disclosure requirements must identify, for example, the name
22 and title of an issued patent, as well as the patent number, the date of filing, the date of issuance,
23 the jurisdiction of issuance, and the patent holder's name and address. SD-3C and the members
24 of the SD Group, however, are exempted from this detailed disclosure. Instead, the IP Policy
25 provides for a general notice that the SD Specification contains "intellectual property held by
26 the SD-3C, LLC and/or [the SD Group members] licensed by the SD-3C, LLC through . . . the
27 SD Memory Card License Agreement," and further states that this vague notice "shall be a
28 sufficient disclosure for purposes of th[e] IP Policy."

- 16 -

55. The IP Policy thus allows SD-3C and the members of the SD Group to avoid disclosing the specific patents owned by Panasonic, SanDisk and Toshiba that they contend are essential for implementation of the Specification. SD-3C has explicitly confirmed that it does not disclose all of the purportedly essential patents included in its license. Instead, to date, SD-3C has disclosed on its website only nine patents owned by the members of the SD Group that "are necessarily and unavoidably infringed by a product that implements the secure digital technology in compliance with the SD Group Specifications." According to SD-3C, the list of patents "is for information purposes only, it is offered by way of example and may not be exhaustive." As described later in this Complaint, individual members of the SD Group have similarly refused to provide definitive accounts of the patents owned by them that they claim to be essential for the implementation of the Specification.

56. In a business review letter of November 12, 2002 concerning 3G wireless communications technology, the DOJ indicated that the pooling of patents among competitors might be justified where there was "the potential for efficiencies with respect to the generation and dissemination of information about essential . . . patents, and the identification and evaluation of which patents are actually essential" to the technology in question. The agreement among Panasonic, SanDisk and Toshiba to combine their SD Card patents cannot be justified on this ground. The members of the SD Group make affirmative efforts, directly and through the use of their faulty SDA rules and otherwise, to bypass the prior MMCA rules and similar standard-setting protections that would stimulate the "generation and dissemination of information" about their patents, and would permit an evaluation as to whether their patents were in fact essential (e.g., if the pool helps to clear blocking patents). Instead, the members of the SD Group have avoided the disclosure of patents claimed by them to be essential to implementation of the Specification and have not demonstrated that these patents are otherwise blocking or essential. By creating doubt among other industry participants as to the actual scope of their patents bearing on SD Cards, the SD Group members' non-disclosure policy discourages third party innovation in SD Card technologies and thereby harms competition. This conduct is not consistent with the activities of a legitimate standard-setting body.

- 17 -

1     57.     Even if the creation of the SD "standard" could have been justified on the

2   basis of its potential efficiencies, the rules imposed on the SDA, and now maintained, by the SD

3   Group members were not necessary to achieve those efficiencies, and had the effect of

4   suppressing innovation and competition. Moreover, even if the combination among the SD

5   Group members could have been justified 10 years ago when the SD Card was first produced,

6   the continued and ongoing agreements among three major competitors to maintain a dominant

7   position in the SD Card and related markets cannot be justified today, given the absence of

8   current efficiencies that could outweigh the combination's ongoing anticompetitive effects.

9           **6.     Suppression of Competing Formats**

10     58.     In addition to exercising collective control over the SD Card format, the

11   members of the SD Group restrain competition by suppressing the emergence of new competing

12   formats. The members of the SD Group have agreed to avoid competing with the SD Card

13   format or technology, and do avoid such competition, as part of their overall agreement to create

14   and maintain a dominant market position for themselves. This restraint on competition is not

15   justified in light of the anticompetitive effects of the overall agreement among Defendants and

16   the members of the SD Group.

17     59.     Moreover, on multiple occasions, one or more members of the SD Group,

18   acting in furtherance of their unlawful purposes, have participated in anticompetitive conduct

19   designed to impede the development of MMC formats that would have competed with SD

20   Cards. For example, in March 2006, SanDisk intervened at the last minute in negotiations at the

21   European Telecommunications Standards Institute (ETSI), disclosing MMC-related patent

22   rights in order to prevent the adoption by ETSI of an MMC-based standard for high-speed SIM

23   (Subscriber Identity Module) cards for use in mobile phones. SanDisk informed ETSI that it

24   would not provide the commitment to license other manufacturers on "fair reasonable and non-

25   discriminatory terms" that ETSI's rules required in order to move forward with an MMC-based

26   SIM card standard. SanDisk had failed to disclose these same patents to the MMCA while it

27   was a member of the board of directors and/or an executive member of that organization. By

28   contrast, SanDisk told ETSI that it would agree to license its patents on fair, reasonable and

- 18 -

1  non-discriminatory terms to other vendors for a SIM card standard based on USB, rather than

2  MMC, technology. As a result of SanDisk's intervention, ETSI's decision on high-speed SIM

3  cards was delayed. After SanDisk had made an unsuccessful attempt to persuade ETSI to adopt

4  an SD Card-based standard, ETSI eventually opted for the USB option notwithstanding the fact

5  that, according to contemporary reports, "handsets that can run MMC-based SIMs could reach

6  the market as much as 18 months before comparable USB-based handsets."

7          60.    On information and belief, other members of the SD Group were informed

8  of and approved SanDisk's anticompetitive actions in ETSI. By discouraging the adoption of

9  standards based on the MMC format in European and other regional standard-setting

10  organizations, SD Group members successfully sought to prevent the format from achieving

11  sufficient scale to be a commercially viable alternative to the SD Card standard anywhere in the

12  world, including the United States.

13          **C.    The SD Group Members' Current Efforts, With SD-3C, To Maintain and
               Exploit Their Dominant Position.**

14

15          61.    The anticompetitive conduct accompanying the establishment of the SD

16  Card regime described above served as a foundation for Defendants' current and continuing

17  illegal efforts, with SanDisk and Toshiba, to maintain and exploit the dominant position that the

18  SD Group members have created for themselves. By creating and manipulating a specification

19  from which other industry participants were excluded, the members of the SD Group gave

20  themselves the ability to extract an "entry fee" toll from all other manufacturers and sellers of

21  SD Cards. By using their combined weight in the host device market, including through PNA,

22  to drive adoption of SD technology in consumer electronic devices, by aggressively

23  undercutting open standard alternatives such as MMC, and by their continued agreement to

24  support only the SD Card format, the members of the SD Group have helped the SD Card to

25  become and remain the dominant flash memory card format.

26          62.    Building on this foundation, Defendants, SanDisk and Toshiba now seek to

27  exploit the dominant position they have created for themselves and to prevent the emergence of

28  alternative flash memory card formats that could undermine their dominance. To this end, and

- 19 -

1  notwithstanding boilerplate language introduced in the most recent versions of the SD Card

2  License, the SD Group members require each existing and potential manufacturer of SD Cards

3  to execute an SD Card License through SD-3C that has the effect of restricting competition and

4  discouraging innovation. The royalty payments required under the SD Card License have the

5  effect of raising the costs of every competing manufacturer of SD Cards. The license's unequal

6  grantback requirement provides competitors with a strong disincentive to develop their own

7  technology. The members of the SD Group have sought further to undermine the pricing

8  freedom of their competitors by attempting to impose new license conditions designed to give

9  the SD Group members the ability to set a "floor price" and to enforce that pricing through the

10  threat of immediate termination (thereby putting at risk a licensee manufacturer's substantial

11  sunk costs).

12      63.    As described in more detail below, Defendants' ongoing anticompetitive

13  conduct has injured and continues to injure both Samsung and competition generally.

14      **1.    The SD Group Members' and SD-3C's Anticompetitive Licensing
15             Agreements**

16      64.    Panasonic, SanDisk, Toshiba and SD-3C require all current and new

17  manufacturers and sellers of SD Cards to accept and execute the SD Card License. The

18  members of the SD Group, jointly with SD-3C, provide no alternative to the SD Card License.

19  Through this requirement, Panasonic, SanDisk and Toshiba effectuate their agreement to jointly

20  license their SD Card technologies exclusively through SD-3C at a single price.

21      65.    The SD Card License grants licensees rights to the purportedly essential

22  patent claims of the SD Group members, the Specification, and the SD logo and trademark. In

23  contrast to the royalty-free terms on which rights to CompactFlash, the MMC Card and other

24  formats had previously been offered, the SD Card License requires licensees to pay a 6 percent

25  royalty on their net sales of SD Cards, with fixed adjustments only for sales volume.

26      66.    SD-3C has provided Samsung with two versions of the SD-3C license, one

27  in March 2003 (the "2003 Agreement"), and another in September 2006 (the "2006

28  Amendment"). As described in detail below, although varying in some respects, both versions

- 20 -

1  contain key anticompetitive provisions, and neither provides an effective means by which to

2  obtain licenses from the SD Group members to the rights granted in the SD Card License. The

3  SD Card License remains for all practical purposes the exclusive means by which the SD Group

4  members license their SD Card technology.

5              **2.    The SD Group Members Have Refused to Negotiate Over the Terms**

6                     **of the SD Card License.**

7         67.    The SD Group members, acting through SD-3C and in furtherance of their

8  agreement to impose controls over competing SD Card manufacturers, have consistently refused

9  to negotiate over the terms of the SD Card License.

10        68.    In early 2003, Samsung sought to obtain an SD Memory Card License at

11 the request of a customer that wished to sell SD Cards assembled by Samsung using Samsung

12 memory components. Samsung first communicated with an employee of Panasonic and Mr.

13 Hiro Miyauchi of Toshiba Corp. Samsung tried to negotiate a license directly with Panasonic,

14 but Panasonic refused and referred Samsung to SD-3C. Toshiba directed Samsung to Michael

15 Quackenbush, who was acting as SD-3C's licensing agent. Mr. Miyauchi of Toshiba provided

16 Samsung with Mr. Quackenbush's contact information at the San Ramon office of Lindquist

17 LLP. Samsung approached Mr. Quackenbush to secure a license to produce SD Memory Cards.

18        69.    Mr. Quackenbush refused, on behalf of the SD Group members, to engage

19 in any negotiations of license terms with Samsung. For example, Samsung asked early in this

20 discussion that Mr. Quackenbush send a Word version of the SD Memory Card License

21 proposed by the SD Group members, to facilitate the exchange of counter-proposals. After

22 initially indicating his assent to this proposal, Mr. Quackenbush subsequently communicated to

23 Samsung that: "I have been asked to not provide the license agreement in a word file to any

24 company. The SD-3C managers are concerned about anyone making changes to the

25 agreement." The SD Card License therefore was offered to Samsung without any opportunity

26 for modification or negotiation of its terms.

27        70.    On September 24, 2003, Samsung signed the agreement in the form offered

28 by SD-3C, without being given any ability to modify or negotiate the contract. The agreement

- 21 -

FIRST AMENDED COMPLAINT                                    Case No. 10-3098 JSW

1    was subsequently signed by officials of Panasonic, SanDisk and Toshiba on behalf of SD-3C.

2    The effective date of the agreement was November 11, 2003.

3           71.    In early September 2006, SD-3C requested a meeting with Samsung to

4    present and discuss its 2006 Amendment. Defendants, Toshiba, and SanDisk had met the prior

5    week (the week of August 28, 2006) in Osaka, Japan, to devise and agree upon this amended

6    version of the SD Card License.

7           72.    The meeting between SD-3C and Samsung took place at Hwasung, Korea,

8    on September 4, 2006. At the meeting, Mr. Quackenbush requested—and Samsung gave—

9    confirmation that Samsung intended shortly to begin making and selling SD Cards. He then

10   described the changes made by the 2006 Amendment to the SD Card License executed by

11   Samsung in 2003, the initial three-year term of which was due to expire on November 11, 2006.

12          73.    Following the meeting in Korea, Mr. Quackenbush emailed Samsung and

13   other SD-3C licensees on September 19, 2006, attaching the 2006 Amendment and demanding

14   that the licensees sign the new agreement. Once again, SD-3C provided no opportunity to

15   negotiate the terms of the 2006 Amendment, which was offered on a take-it-or-leave-it basis.

16   Samsung decided not to sign the new agreement and instead to allow the annual renewal

17   provision of its existing SD Card License to take effect.

18          74.    SD-3C, acting on behalf of Panasonic and the other SD Group members,

19   continued to demand that Samsung execute the 2006 Amendment, including through

20   correspondence on February 1 and 3, 2007, but did not engage in any negotiations over its

21   terms. Samsung again refused to sign the 2006 Amendment. On information and belief, other

22   manufacturers and/or assemblers of SD Cards have executed the 2006 Amendment.

23          **3.    The SD Card Group Provided No Alternative to the SD Card License
24          and Its Provisions.**

25          75.    The refusal of Defendants, Toshiba, and SanDisk to negotiate over the

26   terms of the SD Card License ensured that their competitors—competing manufacturers and

27   sellers of SD Card components and finished SD Cards—would be subjected to the royalty and

28   other provisions of the SD Card License. In furtherance of this agreement, the SD Group

- 22 -

1    members also agreed to provide no mechanism by which to separately license their own claimed

2    essential patents.

3         76.    The 2003 Agreement contains no provision permitting separate licenses of

4    the Essential Patents or other intellectual property from the SD Group members or otherwise. It

5    is, by its terms, the sole vehicle for securing the SD Card rights.

6         77.    Pursuant to Section 2.1 of the 2003 Agreement, Samsung (and other

7    licensees) received a "non-exclusive license, on a worldwide basis during the term hereof, to

8    make, design, have made, use, offer for sale, sell, import, export or otherwise dispose of SD

9    Memory Cards . . . under the Essential Patent Claims Licensable by Licensor." The fact that the

10   license was "non-exclusive" did not mean that it was available from other sources. Instead, the

11   ordinary meaning of "non-exclusive" in this context is that the license did not grant Samsung

12   exclusive rights to the SD Card technologies licensed under the agreement. In fact, pursuant to

13   this provision, other licensees, such as A-Data, Delkin Devices and Phison Electronics, have

14   obtained licenses from SD-3C.

15        78.    The 2006 Amendment also did not realistically permit separate licensing of

16   the rights granted by the SD Card License. The 2006 Amendment included preambulary

17   language and an Article 12.5 purporting to affirm the right of licensees "to separately negotiate

18   a license with any or all SD Group members under any and all Essential Patent Claims

19   Licensable by each such SD Group member under terms and conditions to be independently

20   negotiated by each such member." This is contrary to the position taken by the individual

21   members of the SD Group in their communications with Samsung, including as recently as

22   during 2010. As detailed below, each of the SD Group members has represented that it lacks

23   the authority to license the essential patent claims that are jointly owned by the members of the

24   SD Group.

25        79.    The agreement of Defendants, Toshiba and SanDisk to require competing

26   manufacturers to execute an SD Card License is also confirmed by their public statements. For

27   example, the SD-3C website states explicitly that:

28

- 23 -

FIRST AMENDED COMPLAINT                                                Case No. 10-3098 JSW

> You need to execute the [SD Card License] if you are making
> semi-conductor memory products (e.g., flash memory cards, ROM
> cards, SD I/O Combo Cards, miniSD Cards) which utilize SD
> technology (for example, cards based on the SD Group
> Specifications (as defined in the [SD Card License])).

80.     Even if the purported right to independently license were effective, it
would address only a portion of the rights—the putatively "Essential Patent Claims" owned by
individual members of the SD Group—granted by the SD Card License. In essence, the 2006
Amendment provides that even if licensees could negotiate separate licenses for these Essential
Patent Claims from individual members of the SD Group, those licenses would be in addition to,
rather than a substitute for, the continuing requirement on industry participants to execute the
SD Card License—and thereby pay the SD Group members an "entry fee"—if they wish to
manufacture SD Cards. As a consequence, whether or not individual rights can be obtained
from individual SD Group members, it is still necessary for any manufacturer or seller of SD
Cards to hold a license from SD-3C.

81.     In particular, the SD Card Specification, logo and other trademarks are not
licensable by individual SD Group members. In communications with Samsung, Mr.
Quackenbush, SD-3C's licensing agent, has taken the position that this intellectual property is
available only from SD-3C. For example, on April 14, 2007, Mr. Quackenbush, acting on
behalf of Defendants and the other members of the SD Group, refused to provide Samsung with
requested logo guidelines for the second generation SD Cards, explaining instead that this
intellectual property is "only used by licensees who have signed the [2006 Amendment]." By
conditioning the use of this intellectual property on Samsung's willingness to accept the terms
of the 2006 Amendment, SD-3C confirmed that this intellectual property is available only from
SD-3C.

82.     The SD Group members also use their control over the SD Card
Association to further the requirement that all competing manufacturers of SD Cards execute the
SD Card License. As explained on the SD Association website, "the SD Association's
Licensing Program operates in conjunction with SD-3C" and "SD-3C, LLC represents the

- 24 -

FIRST AMENDED COMPLAINT                                                          Case No. 10-3098 JSW

1   interests of the founding patent holders—Panasonic, SanDisk, and Toshiba—while also serving

2   as the licensing authority for all SD technology." The SD Card Association requires SD Card

3   manufacturers to execute its license (known as the "License Agreement for SDA Memory Card

4   Specification or LAMS"), which obligates licensees to "acknowledge and agree" that

5   manufacturing or selling "SD Memory Cards requires [the] Licensee to enter into the" SD Card

6   License with SD-3C.

7         83.   As described above, even if the SD Group members were willing to enter

8   into separate licenses for their "Essential Patents," Samsung (or another licensee) would still

9   need to obtain an SD Card License. That license provides on its face for a 6 percent royalty

10   rate, and neither the 2003 Agreement nor the 2006 Amendment provide a mechanism for

11   reducing the 6 percent royalty in the event that a party successfully obtained separate licenses

12   from individual members of the SD Group. Mr. Quackenbush confirmed in December 2006, for

13   example, that SD-3C "required a royalty to be paid to SD-3C since the [second generation SD

14   Card also] uses SD-3C technology." As described below, moreover, SD-3C, acting on behalf of

15   the SD Group members, has informed Samsung that the SD-3C License is non-negotiable. In

16   these ways, the members of the SD Group have ensured that the entry fee imposed by the SD-

17   3C license will apply to all other manufacturers and sellers of SD Cards. Because any licensee

18   is required by the terms of the 2003 and 2006 agreements to pay a 6 percent royalty whether or

19   not it separately licenses rights to certain patents from the individual members of SD-3C, and

20   because the terms of the SD-3C licenses are not negotiable, the offer that a licensee could also

21   negotiate separately for patent rights with individual members of SD-3C (and thereby pay an

22   additional royalty on top of the 6 percent fee required by SD-3C) renders that offer to license

23   separately an illusion.

24

25
       **4.**   **The SD Group Members Refuse to Negotiate Separate Licenses for their Essential Patents**

26         84.   In communications with the individual members of the SD Group,

27   including Mr. Richard Chernicoff from SanDisk, Mr. Hiroshi Miyauchi from Toshiba, and Mr.

28   Tetsuyuki Watanabe from Panasonic, Samsung has repeatedly stated that it does not wish to pay

- 25 -

1   the SD-3C royalties, and sought information directly from the SD Group members about their
2   claimed essential patent rights. No member of the SD Group has indicated a willingness to
3   negotiate a separate license with Samsung for SD rights pursuant to Article 12.5 of the 2006
4   Amendment. Instead, all three members of the SD Group have taken the position that the
5   jointly owned Essential Patents can be licensed only through SD-3C. Moreover, two members
6   of the SD Group have taken actions to preclude such negotiations or such a license.

7           85.    Critically, Defendants, Toshiba, and SanDisk have refused to disclose
8   purportedly "essential patents" that would, in the absence of the license, be infringed by a
9   product that implements the SD Specification. As described earlier in the Complaint, through
10  their control and support of SDA, the SD Group members have developed and maintain SDA
11  rules that excuse the SD Group members from disclosing this information under the IP Policy.
12  Defendants, Toshiba and SanDisk also did not provide this information in the 2003 Agreement
13  or the 2006 Amendment. They also have not provided this information through SD-3C, which
14  similarly failed to identify all of the purportedly essential patents, and instead lists on its website
15  only nine patents "for information purposes only" and "by way of example" and further notes
16  that the list "may not be exhaustive." The SD Group members also have refused to disclose this
17  information in bilateral discussions with Samsung. By denying licensees information about
18  their individual patent holdings, the SD Group members have effectively impeded any effort to
19  negotiate separate licenses with individual members of the SD Group.

20          86.    For example, Samsung asked Panasonic during discussions in 2009 to
21  identify the patents owned by Panasonic that are essential to the manufacture of SD Cards and
22  therefore conveyed as part of the SD Card License. Pressed on this point by Samsung,
23  Panasonic identified its five illustrative essential patents as listed on the SD-3C website and
24  eventually showed Samsung a list of 29 patents Panasonic "believe[d] are SD essential patents
25  although they ha[d] not yet been evaluated by a third party evaluator." Panasonic, however,
26  refused to allow Samsung to retain a copy of the list or to confirm that the list was a definitive
27  and comprehensive description of Panasonic's essential SD Card patents.
28

-26-

FIRST AMENDED COMPLAINT                                                    Case No. 10-3098 JSW

1    87.    Similarly, in 2007, Samsung asked SanDisk to identify the patents owned

2    by SanDisk that are essential to the manufacture of SD Cards and therefore conveyed as part of

3    the SD Card License. SanDisk refused to provide Samsung with this information.

4    88.    By declining to provide the requested information on their putative

5    essential patents, Panasonic and SanDisk eliminated any ability on the part of Samsung to

6    negotiate a separate license for these patents. In so doing, Panasonic and SanDisk acted in

7    furtherance of the ongoing and renewed anticompetitive agreement between the members of the

8    SD Group and SD-3C to continue requiring industry participants wishing to manufacture SD

9    Cards to execute an SD Card License.

10    89.    Moreover, as recently as this year, Panasonic has insisted that Samsung

11    deal directly with SD-3C in matters involving licensing of rights to manufacture SD Cards, in

12    lieu of expressing a willingness to engage in separate licensing discussions. For example, in a

13    letter of January 18, 2010, responding to Samsung's concerns about the scope of the claimed

14    "essential patents," and whether they included certain of Panasonic's claimed patents, Mr.

15    Tetsuyuki Watanabe, Director of Panasonic's Licensing Center stated:

16    [Y]our primary grievance appears to stem from your interpretation
      of the [SD Card License] to cover flash memory patent claims as
17    Essential Patent Claims. Although we believe there is no
      ambiguity about it, and that the flash memory claims are clearly
18    excluded, you are kindly requested to contact SD-3C, LLC,
      should you have any questions.

19
20    **5.    The SD Group Members Seek to Exploit Their Dominance By
           Stabilizing SD Card Prices.**

21    90.    The 2006 Amendment also contained two provisions that, taken together,

22    provide Defendants, Toshiba, and SanDisk with the ability to stabilize SD Card prices by setting

23    a "floor price," as well as the ability to monitor and enforce this floor price.

24    91.    First, Article 7.3 of the Amended and Restated Memory Card License

25    ("2006 Amendment") gives to SD-3C the power to determine a "fair market price" for SD Cards

26    that would serve as a minimum reference price for the calculation of licensees' royalty

27    obligations. Under this provision, if a licensee sets a retail price below "fair market price" set

28    by SD-3C, it will be directly penalized by having to pay a higher percentage of its actual retail

- 27 -

FIRST AMENDED COMPLAINT                                    Case No. 10-3098 JSW

1  price as royalty to SD-3C. For example, if the SD-3C determined that the "fair market price"

2  was $50, and the licensee actually charged only $40, it would still need to pay SD-3C a 6

3  percent royalty based on $50 (or $3), thus effectively charging the licensee a 7.5 percent royalty

4  ($3 royalty on a $40 price).

5        92.    The effect of the "floor price" provision is to constrain the ability of

6  licensees to sell SD Cards at prices below a level determined by Panasonic, SanDisk and

7  Toshiba. By agreeing to include this provision in the 2006 Amendment and to coerce licensees

8  into accepting it, Defendants, SanDisk and Toshiba can exploit their market power to ensure

9  that the price of SD Cards is set at a level of their choosing.

10        93.    Second, Panasonic and the other SD Group members included in the 2006

11  Amendment a provision that would permit them to enforce the "floor price" by giving them

12  power over the licensee's continued ability to produce SD Cards. The 2003 Amendment

13  provided a three-year license that was renewable at the licensee's option for up to 10 years.

14  Under this version of the SD Card License, SD-3C could terminate the agreement only in the

15  event of a material breach or a failure to perform any material obligation on the part of the

16  licensee. That provision gave the licensee protection for the significant sunk cost investments in

17  infrastructure and other capital requirements necessary to produce SD Cards.

18        94.    By contrast, Article 14.1 of the 2006 Amendment gave SD-3C (and,

19  through it, the SD Group members) the ability to terminate the agreement each year on the

20  anniversary of the effective date, until the maximum 10-year term of the agreement. This new

21  term increased the SD Group members' leverage over licensees, whose sunk cost investments

22  would now be at the mercy of their competitors, and would greatly increase the pressure to

23  conform to floor pricing levels set by members of the SD Group.

24        **6.    The SD Group Members Seek to Maintain Their Dominance Over
            SD Card Technology Through Improper Grantback Requirements.**

25

26        95.    The SD Card License also includes a grantback provision that has the

27  effect of entrenching the SD Group members' control over SD Card technology. Article 2.4 of

28  the SD Card License requires licensees to grant to each member of the SD Group:

- 28 -

under the Essential Patent Claims Licensable by Licensee, a non-exclusive, non-transferable, royalty-free license to and release from any and all claims of infringement, on a worldwide basis, to make, design, have made, use, offer to sell, sell, import, export or otherwise dispose of SD Memory Cards . . . .

96.    The requirement that licensees give SD Group members royalty-free access to any new essential technology they might develop contrasts with the 6 percent royalty demanded by SD Group members for their own essential patent claims. This provision ensures that licensees can expect to receive no financial reward for developing technology for use in SD Cards and submitting the technology for inclusion in the Specification. This provision necessarily has the effect of limiting licensees' development and contribution of technology that would reduce the share of SD Card technology owned by the SD Group members and SD-3C.

97.    The grantback provision of the SD Card License fails to protect against the threat of anticompetitive harm associated with such provisions. In its 1999 business review letter related to DVD licensing practices, the DOJ recognized the potential for grantback provisions to result in "significant discouragement of research and development." The letter indicated that this potential can be alleviated by arrangements that ensure that licensees subject to a grantback provision benefit from introducing new essential patents into the pool.

98.    The SD Card License grantback provision lacks the critical redeeming feature highlighted by DOJ—that is, the ability of a licensee to benefit from its innovation efforts. Instead, innovation on the part of a licensee will support royalties earned by the SD Group members, which undermines or eliminates the incentive for innovation.

99.    Moreover, the anticompetitive effect of the grantback provision is magnified because licensees do not have access to the SD Group members' claimed essential patent portfolios. That failure to disclose further impedes the ability of the licensees to design improvements, or otherwise take into account the claimed essential patents, and impairs the ability of licensees to identify intellectual property (even their own) that might be subject to the grantback provision. In contrast to a legitimate patent pool, which is based on transparency, the secretive operation of the SD Group members' combination increases its anticompetitive

- 29 -

1   effects.

2          100.  For these reasons, the grantback provision's significant potential to harm

3   competition among technologies outweighs any potential procompetitive benefit.

4          **7.     The SD Card License Does Not Convey All of the Rights to Make an
5                   SD Card From the SD Group Members.**

6          101.  Panasonic, SanDisk and Toshiba claim substantially all of the flash

7   memory technology rights needed to manufacture an SD Card.  Instead of including these rights

8   within the scope of the SD Card License, however, these companies have agreed to hold back

9   their flash memory rights from the SD Card License.  Each of Panasonic, SanDisk and Toshiba

10  requires competing manufacturers of SD Cards to license their respective flash memory rights in

11  separate bilateral license agreements.

12         102.  Consistent with these requirements, the SD Card License requires licensees

13  to pay a 6 percent royalty, but by its terms does not provide licensees with all the rights needed

14  to manufacture an SD Card.  Article 2.3 of the SD Card License provides:

15         "IT IS EXPRESSLY UNDERSTOOD THAT THE RIGHTS AND LICENSES
16         GRANTED PURSUANT TO THIS AGREEMENT DO NOT EXTEND TO ANY
           SEMICONDUCTOR MEMORY TECHNOLOGY OR SEMICONDUCTOR
17         PROCESS/PACKAGING TECHNOLOGY."

18         103.  By requiring SD Card licensees to enter into separate bilateral transactions

19  for their memory technology, the SD Group members have eliminated any efficiency benefit

20  stemming from the pooling of their putative essential SD Card patents in the SD Card License.

21  To the contrary, the need to license the SD Group members' intellectual property both from SD-

22  3C and from the members themselves increases the transaction costs for a licensee seeking to

23  manufacture SD Cards.  That increased cost and decreased efficiency is particularly striking

24  because the SD Group members simultaneously require licensees to negotiate memory licenses

25  with them directly and refuse to offer the rights to all of the SD Card-related technology during

26  that negotiation.

27         104.  The separate licensing of memory technology also provides the SD Group

28  members with an additional opportunity to extract additional royalties from licensees that

- 30 -

1  increase the cost advantage enjoyed by SD Group members in the manufacture of SD Cards.

2  105. That cost advantage is magnified by the structure of the SD Card License

3  royalty itself. Although the SD Card License purports to exclude flash memory rights from its

4  scope, and although the SD Group members charge licensees for the rights to that intellectual

5  property, the SD Card License nonetheless bases royalties on the memory portion of the SD

6  Card.

7  106. Specifically, the SD Card License provides that the 6 percent royalty is

8  payable on net sales of SD Cards, rather than on a per-card basis. The price of an SD Card, and

9  therefore the amount of royalty owed, is generally proportional to the amount of flash memory

10  contained within it. For example, the advertised price of SanDisk SD/SDHC Cards at

11  www.flash-memory-store.com on July 15, 2010 was $9.95 for 2 GB, $14.95 for 4 GB, $21.95

12  for 8 GB, $34.95 for 16 GB and $73.95 for 32 GB. The cost of non-memory components in SD

13  Cards does not vary significantly, regardless of the memory capacity of the card in which they

14  are incorporated. By requiring royalties to be calculated based on net sales, the SD Card

15  License therefore effectively requires that licensees pay a royalty with respect to the quantity of

16  memory included in an SD Card, even though that memory is expressly excluded from the

17  scope of the license grant.

18
### 8. Panasonic, SanDisk and Toshiba Continue to Renew and Reaffirm
19  Their Unlawful Agreement With SD-3C.

20  107. Defendants, SanDisk and Toshiba continue actively to further their

21  anticompetitive agreement, and have continually reaffirmed and renewed the anticompetitive

22  arrangements among themselves designed to maintain their monopoly of SD Card technology

23  and their dominance of the SD Card markets. In November 2007, for example, the members of

24  the SD Group and SD-3C executed a Second Amended and Restated Master Licensing

25  Agreement renewing the SD Group members' agreement to collectively license their SD Card

26  technology only through SD-3C and at a single price.

27  108. In furtherance of these renewed and ongoing agreements, the SD Group

28  members have taken the position in their bilateral negotiations with Samsung that they lack the

- 31 -

1    authority to negotiate separate licenses with SD Card manufacturers for any jointly owned SD-

2    3C intellectual property. Similarly, the SD Group members prevent SD-3C from varying the

3    terms of its license, thereby rendering ineffective any potential separate license of essential

4    patents. By these means, the SD Group members and SD-3C continue to ensure that any

5    licenses granted by individual SD Group members would still require payment of an additional

6    "entry fee," not paid by members of the SD Group, that the SD Card License imposes on rival

7    manufacturers of SD Cards.

8                    **9.     The SD Card License is Part of the SD Group Members' Broader
                             Effort to Jointly Create and Maintain a Permanent Cost Advantage
9                            Over Competitors.**

10           109.  The effect and necessary purpose of the agreements among Panasonic,

11   SanDisk, Toshiba and SD-3C has been to impose and maintain costs on competitors that the

12   members of the SD Group do not itself bear. To this end, in parallel with their agreement to

13   license their SD Card patents through SD-3C at a single price, the members of the SD Group

14   have entered into cross-licensing arrangements that granted them royalty-free access to the

15   patents for which they charge others an entry fee. In its annual report for 1999, for example,

16   SanDisk disclosed:

17                  While other flash card manufacturers will be required to pay the
                    SD Association license fees and royalties which will be shared
18                  between [Panasonic], Toshiba and SanDisk, there will be no
19                  royalties or license fees payable among the three companies for
                    their respective sales of the Secure Digital Memory Card.
20

21           110.  On information and belief, the SD Group members continue to abide by

22   these cross-licensing arrangements. In conjunction with the other elements of their licensing

23   arrangements, including the agreement to license SD Card technology only through SD-3C and

24   at a single price, to withhold critical memory technology from the SD Card license, to impose

25   an entry fee on competitors, and to impose unequal grantback and price stabilization provisions

26   on licensees, this cross-licensing agreement allows three major competitors to enjoy a

27   permanent cost advantage over other competing manufacturers and sellers of SD Cards. This

28   combination does not provide efficiencies that outweigh its significant anticompetitive effects.

- 32 -

**D.** **The Effects of Defendants' Conduct on Competition and on Plaintiff's Business**

111. The illegal and ongoing combination among Defendants and the other members of the SD Group has suppressed competition in the markets for SD Cards and related technologies and products. That combination has caused, and continues to cause, injury to Samsung and other current and new entrants into these markets. The SD Card, including second generation form factors such as miniSD and microSD, is now the dominant format in the flash memory card market. The SDA states that it is "the de-facto industry standard" and that "SD technology is used by more than 400 brands across dozens of product categories and in more than 8,000 models." SD Cards (including miniSD and microSD Cards) accounted for more than 80 percent of all flash memory cards sold worldwide in 2009. MMC cards, by contrast, represent only a negligible portion of the flash memory cards sold and used by consumers. Defendants are perpetuating their illegal combination to maintain the dominance of this format and their control over it, and to restrain competition from other SD Card manufacturers and other products and technologies.

112. The conspiracy between Defendants and the other members of the SD Group has suppressed the emergence of new and different flash memory card formats. In contrast to the profusion of new formats entering the market during the 1990s, no significant alternative to the SD Card format has been introduced since the SD Card was launched in 2000. SD Group members have reduced competition in flash memory card technology, including by agreeing among themselves not to compete with the SD Card format, by imposing grantback provisions on SD Card manufacturers that inhibit the emergence of new and improved technologies, and by actively impeding the emergence of competing new formats. Consumers have been harmed by the resulting diminution in choice between flash memory card formats, by the decreased innovation in SD Card and flash memory technologies, and by the restraints imposed on the SD Card and related markets by Defendants, Toshiba and SanDisk.

113. Samsung is suffering ongoing injury as a result of the illegal combination among Defendants, Toshiba and SanDisk. Samsung manufactures and supplies flash memory

- 33 -

1    card components and finished SD Cards in competition with the SD Group members, including
2    to such companies as Nokia and RIM. As a manufacturer, Samsung is injured by the
3    anticompetitive effects of the illegal combination, including by the permanent cost advantage
4    that the SD Group members have created for themselves in this market, which have diminished
5    Samsung's ability to compete for sales of these products.

6            114. As a supplier of flash memory card components and finished SD Cards to
7    other manufacturers and assemblers, Samsung has been injured and is continuing to be injured
8    by the anticompetitive effects of the illegal combination, including by the permanent cost
9    advantage that the SD Group members have created for themselves in this market. This
10   ongoing cost advantage diminishes the ability of these manufacturers and assemblers to compete
11   for sales against the SD Group members, thereby depressing Samsung's sales to these
12   customers. Further, this ongoing cost advantage diminishes Samsung's ability to compete
13   effectively for sales of SD Card components against the SD Group members. As a result, on an
14   ongoing basis, continuing to the present, Samsung sells fewer SD Card components and finished
15   SD Cards to its customers than would otherwise be the case. For example, multiple customers
16   have decreased or withdrawn component orders as a result of the costs imposed by the SD
17   Group members' and SD-3C's illegal combination on sales of SD Cards. Moreover, Samsung's
18   sales of finished SD Cards to customers have diminished since 2007 as the additional costs
19   imposed by the illegal combination have hindered retail sales of SD Cards by non-SD Group
20   members. For example, during this time, one of Samsung's SD Card customers switched its
21   source of supply to Toshiba and away from Samsung. Toshiba, like Panasonic, enjoys the
22   permanent cost advantage created by the illegal combination, and therefore has a continuing and
23   ongoing cost advantage against Samsung as a supplier of SD Cards and components to third-
24   party customers.

25           115. Further, as a manufacturer of SD Cards, Samsung has been required to
26   abide by the SD Card License without any opportunity to renegotiate its anticompetitive terms,
27   or to separately license the intellectual property rights from the SD Group members. Pursuant
28   to the license, Samsung has been required to pay an entry fee to SD-3C, a significant proportion

- 34 -

1    of which relates to purportedly unlicensed memory contained in SD Cards sold by Samsung.

2    By mid-2009, Samsung had paid more than $80 million to SD-3C in royalties pursuant to its SD

3    Memory Card License. Moreover, the artificial exclusion of memory technology rights from the

4    scope of the SD License has forced Samsung to enter into additional royalty-bearing license

5    agreements covering such memory rights with each member of the SD Group, effectively

6    amounting to a double royalty on SD Cards, increasing transaction and royalty costs, and again

7    negating any licensing efficiencies that could have flowed from the activities of SD-3C, acting

8    on behalf of Panasonic and its other principals.

9         116. The individual members of the SD Group have benefited, and continue to

10   benefit, handsomely from their anticompetitive agreement. This conduct has allowed the

11   members of the SD Group to extract hundreds of millions of dollars in royalty flows each year

12   from numerous competing flash card manufacturers, as well as to enjoy the fruits of their

13   dominant share of the SD Card market. The burden of the royalties and other anticompetitive

14   restraints has handicapped the ability of rival manufacturers to compete with SD Group

15   members in the sale of SD Cards. As a result, Panasonic, SanDisk and Toshiba have been able

16   collectively to dominate the SD Card product market, together accounting for approximately 65-

17   70 percent of the U.S. retail market (including cards manufactured by an SD Group member and

18   sold by a third party under its own brand name). The SD Group members collectively account

19   for a dominant share of both standard format SD Cards (even allowing for the negligible sales

20   volume of MMC cards that can be operated in some cases in SD Card slots) and second

21   generation SD Cards, such as miniSD and microSD Cards. The SD Group members' collective

22   share of the total U.S. market for SD Cards, including both retail and sales to original equipment

23   manufacturers such as Motorola, is greater than 70 percent. Consumers have paid higher prices

24   for SD Cards, and have enjoyed diminished choice and innovation, than would have been the

25   case if SD Group members had been required to compete on an even playing field with other

26   manufacturers.

27                              **RELEVANT MARKETS**

28        117. There is a relevant antitrust market in the sale of finished SD Cards to third

- 35 -

FIRST AMENDED COMPLAINT                                                      Case No. 10-3098 JSW

1  parties for use with devices that contain slots made for SD Cards (the "SD Card market"). Such

2  finished SD Cards are broadly used in interstate commerce for a range of applications, including

3  particularly for data storage in digital cameras, PDAs, digital audio players, and other electronic

4  devices equipped with an SD Card slot. Millions of such devices have been sold, and continue

5  to be sold, in the United States. Consumers with devices equipped with a SD card slot generally

6  would regard an SD Card as the only option for use in the devices. Most consumers who

7  operate a device that has an SD Card slot would not regard any memory card other than an SD

8  Card as a reasonably interchangeable for the memory card required by that device. Even if an

9  MMC Card could be used in an SD Card slot in some devices, this is not true for all devices

10 with SD Card slots. Even for devices with an SD Card slot that could technically accept an

11 MMC Card, most consumers would in any event not be aware of that technical substitutability.

12 Those customers would not regard an MMC Card as interchangeable in use even for devices

13 that technically might be able to use an MMC Card in lieu of an SD Card.

14         118. There is a relevant antitrust market in the sale of finished second

15 generation SD Cards, such as miniSD and microSD Cards, to third parties for use with devices

16 that contain slots that require second generation SD Cards (the "Second Generation SD Card

17 market"; collectively with the "SD Card Market" the "SD Card Markets"). In such devices, the

18 Second Generation SD Cards will be the only available option for operating the device in

19 conjunction with a flash memory card. Such finished Second Generation SD Cards are broadly

20 used in interstate commerce for a range of applications, including particularly for data storage in

21 smaller sized electronic devices, such as mobile telephones, equipped with a Second Generation

22 SD Card slot. Millions of such devices have been sold, and continue to be sold, in the United

23 States. Consumers with devices equipped only with a Second Generation SD card slot would

24 not regard any other kind of flash memory card as a reasonably interchangeable alternative to a

25 Second Generation SD Card.

26         119. There is a separate relevant antitrust market in the technology used in the

27 production of SD Cards, consisting of technology developed for this end-use or that might be

28 applied toward this end-use (the "SD Card Technology market"). The SD Card Specification

- 36 -

FIRST AMENDED COMPLAINT                                                    Case No. 10-3098 JSW

1    requires that certain SD Card functions be implemented either by a specific technology or by a

2    particular solution for which the technological options are limited. The technologies required

3    by the Specification or capable of providing a solution required by the Specification are not

4    reasonably interchangeable with other technologies.

5            120. There is a separate relevant antitrust market in the technology used in the

6    production of flash memory cards (the "Flash Memory Card Technology market"). This

7    includes not only technology used in the production of SD Cards but also technology used in the

8    production of other flash memory card formats. The technologies included in the Flash Memory

9    Card Technology market are not reasonably interchangeable with other technologies that are not

10   suitable for use in flash memory cards.

11           121. There are no barriers to the interstate sale or exchange of SD Cards, SD

12   Card Technology or Flash Memory Card Technology. Accordingly, in each case above, the

13   relevant geographic market is the United States and its territories, or, alternatively, the world.

14   Competition among SD Cards and technology occurs on a uniform basis throughout the United

15   States and throughout the world.

16                                    **CAUSES OF ACTION**

17                                          **CLAIM I**
     **Agreement in Restraint of Trade in Violation of Section 1 of the Sherman**
18                         **Act against Panasonic and SD-3C LLC**

19                                **(in the SD Card Markets)**

20           122. Plaintiff hereby incorporates by reference Paragraphs 1 through 121 of this

21   Complaint, as though fully set forth herein.

22           123. Panasonic, SD-3C and the other members of the SD Group entered into a

23   continuing contract, combination, agreement, and/or conspiracy to unreasonably restrain trade

24   and commerce in the markets for SD Cards.

25           124. By agreeing to require industry participants wishing to manufacture SD

26   Cards to execute an SD Memory Card License and at a single price, Panasonic, the other

27   members of the SD Group and SD-3C have raised the costs of other manufacturers of SD Cards,

28   thereby reducing competition in the SD Card markets. The SD Card License requires SD Card

                                              - 37 -

FIRST AMENDED COMPLAINT                                              Case No. 10-3098 JSW

1 manufacturers to pay a royalty of 6 percent on net sales of all SD Cards, but the SD Group
2 members have exempted themselves from this fee. The entry fee required by the SD Card
3 License insulates SD Group members from competition in the SD Card market by giving them a
4 permanent cost advantage over rival manufacturers. The adverse effect of this cost advantage
5 on competition in the SD Card market is exacerbated by the additional royalties that SD Group
6 members separately demand from competitors for licenses to their flash memory patents. As a
7 result of their strategy of raising the costs of rival manufacturers, the SD Group members have
8 been able to establish and maintain a dominant position in the SD Card markets. Through their
9 dominant position the members of the SD Group have sought to impose increasingly onerous
10 and anticompetitive terms on potential licensees, including—since September 2006—terms that
11 would have the effect of stabilizing SD Card prices. These agreements to restrain competition
12 are ongoing and continuing.

13          125. The anticompetitive effects of the agreement between Panasonic, SD-3C
14 and the other members of the SD Group are not offset by any countervailing benefits. Absent
15 the agreement between the members of the SD Group, other industry participants were ready
16 and willing to develop a flash memory card with substantially the same functionality of an SD
17 Card. Panasonic, SanDisk and Toshiba have made no showing that their agreement to jointly
18 develop and jointly license flash memory card technology has cleared blocking patent positions
19 held by those companies. The single, pooled license offered by SD-3C does not enhance
20 licensing efficiency by eliminating the need for multiple licenses. On information and belief,
21 the key patent rights covering flash memory used in SD Memory Cards are claimed by the SD
22 Group members. By its terms, however, the SD Card License excludes these rights, thereby
23 requiring that companies that wish to manufacture SD Cards seek separate licenses for flash
24 memory technology from each of Panasonic, SanDisk and Toshiba.

25          126. The unreasonable restraint of trade created by Defendants' agreement, and
26 the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance
27 thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and
28 property.

- 38 -

FIRST AMENDED COMPLAINT                                                      Case No. 10-3098 JSW

1    127. An actual, justiciable controversy appropriate for damages and declaratory

2  relief exists among the parties.

3                                              **CLAIM II**
                **Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act**
4                                        **against Panasonic and SD-3C LLC**

5                                     **(in the SD Card Technology Market)**

6    128. Plaintiff hereby incorporates by reference Paragraphs 1 through 127 of this

7  Complaint, as though fully set forth herein.

8    129. Panasonic, SD-3C and the other members of the SD Group entered into a

9  continuing contract, combination, agreement, and/or conspiracy to unreasonably restrain trade

10  and commerce in the SD Card Technology market.

11    130. Panasonic conspired with SanDisk and Toshiba to manipulate the SD Card

12  Specification by arbitrarily requiring the use of patent rights owned by SD Group members to

13  implement non-central features of the card. The SD Group members, through SD 3-C, also

14  required all other industry participants wishing to manufacture SD Cards to execute an SD

15  Memory Card License. By this means, the SD Group members have agreed on a single price

16  that all three SD Group members will charge for their technology related to SD Cards. By the

17  same means, the SD Group members have foreclosed competition from alternative technologies

18  that, absent the SD Group members' manipulation of the SD Specification, could be used to

19  implement aspects of that Specification. In addition, Panasonic and SD-3C have agreed with

20  the other members of the SD Group to include in the SD Card License a discriminatory

21  grantback provision that has the purpose and effect of discouraging licensees from developing

22  SD Card technologies that might compete with the technologies owned by SD Group members.

23  As the SD Card standard has gained broader market acceptance, the SD Group members,

24  working through SD-3C, have sought to exploit their control of purportedly essential technology

25  to impose increasingly onerous and anticompetitive terms—since September 2006—on current

26  licensees, such as Samsung, and potential licensees.

27    131. For the reasons set forth above, including in paragraph 125, the

28  anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of

- 39 -

FIRST AMENDED COMPLAINT                                              Case No. 10-3098 JSW

1  the SD Group are not offset by any countervailing benefits.

2         132. The unreasonable restraint of trade created by Defendants' agreement, and

3  the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance

4  thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and

5  property.

6         133. An actual, justiciable controversy appropriate for damages and declaratory

7  relief exists among the parties.

8                              **CLAIM III**
   **Agreement in Restraint of Trade in Violation of Section 1 of the Sherman**
9              **Act against Panasonic and SD-3C LLC**
              **(in the Flash Memory Card Technology Market)**
10

11        134. Plaintiff hereby incorporates by reference Paragraphs 1 through 133 of this

12  Complaint, as though fully set forth herein.

13        135. Panasonic and SD-3C entered into a continuing contract, combination,

14  and/or conspiracy with the other members of the SD Group to unreasonably restrain trade and

15  commerce in the market for Flash Memory Card Technology.

16        136. Panasonic, SanDisk and Toshiba were significant horizontal competitors in

17  the Flash Memory Card Technology market. Prior to their agreement to form the SD Group, the

18  three companies developed competing flash memory card technologies and reached independent

19  decisions on whether and at what price to license those technologies to other industry

20  participants. Following their independent business judgment, each company supported open

21  standard-setting initiatives as a means of encouraging industry adoption of the flash memory

22  card technologies they had developed.

23        137. Panasonic's agreement with the other SD Group members and SD-3C has

24  caused anticompetitive effects in the Flash Memory Card Technology market. Acting in

25  furtherance of their agreement designed to achieve control over the SD Card and to make that

26  card the dominant industry standard, Panasonic, SanDisk and Toshiba have agreed not to

27  support the development of formats that could compete with the SD Card, thereby discouraging

28  the development of new flash memory card technologies. Panasonic's participation in this

- 40 -

FIRST AMENDED COMPLAINT                                    Case No. 10-3098 JSW

1  agreement has denied the potential sponsors of new flash memory card technologies the

2  cooperation of an important manufacturer (Panasonic Corp.) and distributor (PNA) of host

3  devices, creating a significant barrier to the propagation of new formats. By agreeing to include

4  a discriminatory grantback provision in the SD Card License, and by continuing efforts to

5  require current and potential manufacturers of SD cards to execute this license, the SD Group

6  members have reduced the incentive of other industry participants to develop alternative flash

7  memory card technologies. Individual members of the SD Group have sought to impair the

8  ability of other formats, in particular the MMC card, to compete effectively. On information

9  and belief, the relevant conduct of these SD Group members was known and approved by the

10  Group's other members. These agreements to restrain competition are ongoing and continuing.

11      138. For the reasons set forth above, including in paragraph 125, the

12  anticompetitive effects of the agreement between Panasonic, SD-3C and the other members of

13  the SD Group are not offset by any countervailing benefits.

14      139. The unreasonable restraint of trade created by Defendants' agreement, and

15  the effects thereof, continue. As a result of Defendants' agreement and acts in furtherance

16  thereof, Samsung has suffered and will continue to suffer irreparable injury to its business and

17  property.

18      140. An actual, justiciable controversy appropriate for damages and declaratory

19  relief exists among the parties.

20                          **CLAIM IV**
                **Monopolization in Violation of Section 2 of the Sherman Act**

21                          **against SD-3C LLC**
                   **(SD Card Technology Market)**

22

23      141. Plaintiff hereby incorporates by reference Paragraphs 1 through 140 of this

24  Complaint, as though fully set forth herein.

25      142. SD-3C holds monopoly power in the market for SD Card Technology.

26  SD-3C licenses substantially all of the purportedly essential patent claims covering SD Cards

27  under the Specification developed by the SD Group members. On information and belief, other

28  members of the SDA have not identified any patent rights owned by them that are essential for

- 41 -

FIRST AMENDED COMPLAINT                                      Case No. 10-3098 JSW

1  manufacture of SD Cards under the Specification.

2  143. SD-3C has engaged in exclusionary conduct in order to acquire and

3  maintain this monopoly power. It has collaborated in the manipulation of the Specification by

4  the members of the SD Group, by representing patent rights owned by SD Group members as

5  essential for implementation of the Specification and collecting royalties on that basis. It has

6  failed to disclose fully all the patents owned by SD Group members that the SD Group members

7  and SD-3C claim to be essential for implementation of the Specification. It has coerced

8  industry participants into taking an SD Card License that imposes a supra-competitive royalty

9  fee on companies other than the members of the SD Group and incorporates a discriminatory

10  grantback provision, requiring licensees to give SD Group members royalty-free access to any

11  essential patent claims the licensees may themselves develop covering SD Cards. This

12  grantback provision has the purpose and effect of depriving competitors of the incentive to

13  develop competing SD Card technologies. Using its monopoly power, SD-3C has sought to

14  impose increasingly onerous and anticompetitive terms on potential licensees, including—since

15  September 2006—terms that would have the effect of stabilizing SD Card prices.

16  144. Defendant's unlawful monopoly in the SD Card Technology market and

17  the effects thereof continue.

18  145. An actual, justiciable controversy appropriate for damages and declaratory

19  relief exists among the parties.

20  **CLAIM V**
**Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act**
21  **against Panasonic and SD-3C LLC**
**(SD Card Technology Market)**
22

23  146. Plaintiff hereby incorporates by reference Paragraphs 1 through 145 of this

24  Complaint, as though fully set forth herein.

25  147. Panasonic and SD-3C conspired with the other members of the SD Group

26  unlawfully to acquire monopoly power in the market for SD Card Technology, in violation of

27  Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants entered into this conspiracy with the

28  specific intent of obtaining by unlawful means a monopoly in this market.

- 42 -

1      148. Defendants have each committed one or more overt acts in furtherance of

2   the conspiracy to monopolize the SD Card Technology market. Panasonic has joined with

3   SanDisk and Toshiba to exclude and disadvantage rivals by, among other things, (1) agreeing to

4   jointly replace an existing open standard format with the SD Card and then to jointly license

5   their rights to that card at a single price; (2) manipulating the SD Specification to arbitrarily

6   require the use of their own patents and foreclose other potential competing formats; (3)

7   requiring companies that want to manufacture or sell SD Cards to enter into the SD License

8   with SD-3C; (4) requiring users of SD Card Technology, other than themselves, to pay an

9   anticompetitive entry fee under the SD Card License; and (5) imposing on licensees a

10  discriminatory grantback provision that discourages the development of competing SD Card

11  technologies. SD-3C has enforced the SD Group members' anticompetitive scheme, including

12  its unequal licensing and grant-back provisions, in furtherance of the objectives of the

13  conspiracy.

14      149. Panasonic and the SD Group members' unlawful conspiracy to monopolize

15  and the effects thereof continue.

16      150. An actual, justiciable controversy appropriate for damages and declaratory

17  relief exists among the parties.

18  **CLAIM VI**
**Declaratory Judgment of Unenforceability for Patent Misuse**
19  **by Panasonic and SD-3C LLC**

20

21      151. Plaintiff hereby incorporates by reference Paragraphs 1 through 150 of this

22  Complaint, as though fully set forth herein.

23      152. By its terms, the SD Card License offered by SD-3C on behalf of

24  Panasonic and the other SD Group members does not grant rights to the flash memory

25  technology needed to manufacture an SD Memory Card.

26      153. The SD Card License requires the payment of royalties calculated as a

27  percentage of the total value of the SD Card, including the memory.

28      154. SD-3C offered the SD Card License to Samsung as a non-negotiable

- 43 -

FIRST AMENDED COMPLAINT                                    Case No. 10-3098 JSW

1  proposal, and used the leverage of its purported patent rights to coerce Samsung into accepting

2  the license terms.

3         155.  The price of SD Cards varies in proportion to the amount of flash memory

4  they contain.

5         156.  The SD Card License accordingly extracts a royalty based on non-licensed

6  goods. A patentholder engages in patent misuse when it charges royalty on an unlicensed good

7  or the unlicensed component of a good. Accordingly, Panasonic's conduct constitutes unlawful

8  patent misuse and renders the patents covered by the SD Card License unenforceable.

9         157.  This patent misuse, and the effects thereof, continue.

10         158.  An actual, justiciable controversy appropriate for declaratory relief exists

11  among the parties.

12                              **CLAIM VII**
      **Unfair Competition Under California Business and Professions Code Section 17200 et seq.**
13                              **against Panasonic**

14         159.  Plaintiff hereby incorporates by reference Paragraphs 1 through 158 of this

15  Complaint, as though fully set forth herein.

16         160.  The acts and conduct of Panasonic as alleged above in this Complaint

17  constitute methods of unlawful, unfair, and/or fraudulent business practice as defined by

18  California Business & Professions Code Section 17200.

19         161.  Panasonic's acts and practices, as described above, amount to an unlawful

20  business act or practice under Section 17200 in at least the following respects. Panasonic (1)

21  entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade

22  and commerce; (2) manipulated the standard-setting process to raise costs to rivals and

23  significantly threaten or harm competition; (3) required non-negotiable and discriminatory

24  grantback requirements on SD Card licensees; and (4) thereby foreclosed the development of

25  other flash memory card technologies.

26

27

28

                                    - 44 -

FIRST AMENDED COMPLAINT                                    Case No. 10-3098 JSW

1

2

3

**CLAIM VIII**
**Violation of the Cartwright Act,**
**California Business and Professions Code Section 16700 et seq.**
**against Panasonic**

4     162. Plaintiff hereby incorporates by reference Paragraphs 1 through 161 of this

5  Complaint, as though fully set forth herein.

6     163. Panasonic has, through the acts and conduct described herein, entered into

7  an unlawful trust as defined by California Business & Professions Code Sections 16720 and

8  16726.

9     164. Panasonic and the SD Group member entered into a combination with the

10  purpose of restraining competition by, among other things: (1) limiting or reducing the

11  production of and/or increasing the price of flash memory card technology, SD Card

12  technology and SD Cards; (2) preventing competition in the sale of flash memory card

13  technology, and SD Cards; and (3) fixing the price of SD Card technology;

14     165. As a result of Panasonic's actions, trade and commerce have been

15  restrained in the following markets: (1) the Flash Memory Card Technology Market; (2) the SD

16  Card Technology Market; and (3) the SD Card Market.

17     166. Plaintiff has been harmed by Panasonic's unlawful conduct, by being

18  required to pay higher royalties for the production of SD Cards than it would have in a free and

19  competitive market, and through foreclosure of its ability to sell SD Cards and components to its

20  customers.

21     167. Such effects are continuing and will continue until injunctive relief is

22  granted.

23                          **PRAYER FOR RELIEF**

24     WHEREFORE, Plaintiff seeks the following relief:

25     1. Pursuant to 28 U.S.C. § 2201, a declaration that Panasonic and SD-3C have

26  unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

27     2. Pursuant to 28 U.S.C. § 2201, a declaration that the SD Card License is an

28  unreasonable restraint of trade that violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

- 45 -

FIRST AMENDED COMPLAINT                                           Case No. 10-3098 JSW

1         3. Pursuant to 28 U.S.C. § 2201, a declaration that SD-3C has monopolized the

2 market for SD Card Technology in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

3         4. Pursuant to 28 U.S.C. § 2201, a declaration that Panasonic and SD-3C have

4 engaged in a conspiracy to monopolize the SD Card Technology market in violation of Section

5 2 of the Sherman Act, 15 U.S.C. § 2;

6         5. Pursuant to 28 U.S.C. § 2201, a declaration that the royalty provision of the

7 SD Card License constitutes patent misuse and that all patents covered by the license are

8 unenforceable;

9         6. Restitution of all sums paid as royalties by Samsung under the SD Card

10 License since the execution thereof;

11         7. Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or

12 proper based upon the Court's declaratory judgment;

13         8. Pursuant to 15 U.S.C. § 15, trebled damages resulting from Panasonic's and

14 SD-3C's violations of the Sherman Act;

15         9. Injunctive relief preventing and restraining Defendants from collecting

16 royalties on SD Cards manufactured by third parties;

17         10. Pursuant to California Business & Professions Code Sections 16750 and

18 17203, restitution of royalties paid by Samsung under the SD Card License since the date of

19 execution and an injunction to prevent Panasonic's continued acts of unfair competition;

20         11. Pre-judgment and post-judgment interest at the maximum legal rate;

21         12. Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this

22 action; and

23

24

25

26

27

28

- 46 -

1    13. Such other relief as the Court may deem just and proper.

2

3    Dated: October 14, 2010                    COVINGTON & BURLING LLP

4

5                                        By: _____/s/_____
                                               Simon J. Frankel
6                                              Attorneys for Plaintiff
                                               SAMSUNG ELECTRONICS CO., LTD.
7

8                            **DEMAND FOR JURY TRIAL**

9        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

10   by jury.

11

12   Dated: October 14, 2010                    COVINGTON & BURLING LLP

13

14                                       By: _____/s/_____
                                               Simon J. Frankel
15                                             Attorneys for Plaintiff
                                               SAMSUNG ELECTRONICS CO., LTD.
16

17

18

19

20

21

22

23

24

25

26

27

28

                                          - 47 -
     FIRST AMENDED COMPLAINT                                      Case No. 10-3098 JSW